279 F.2d 716
 UNITED MINE WORKERS OF AMERICA and United Mine Workers of America, District 19, Appellants,
v.
OSBORNE MINING COMPANY, Inc., Appellee.
OSBORNE MINING COMPANY, Inc., Appellant,
v.
UNITED MINE WORKERS OF AMERICA and United Mine Workers of America, District 19, Appellees.
UNITED MINE WORKERS OF AMERICA and United Mine Workers of America, District 19, Appellants,
v.
LOVE AND AMOS COAL COMPANY, Appellee.
LOVE AND AMOS COAL COMPANY, Appellant,
v.
UNITED MINE WORKERS OF AMERICA and United Mine Workers of America, District 19, Appellees.
 Nos. 13871-13874.
 United States Court of Appeals Sixth Circuit.
 June 7, 1960.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED J. Clarence Evans, of Farris, Evans & Evans, Nashville, Tenn., Harley G. Fowler, John A. Rowntree of Fowler, Rowntree & Fowler, Knoxville, Tenn. (Harley G. Fowler, Knoxville, Tenn., of counsel), for Osborne Mining Company, Inc., and Love and Amos Coal Company.
 E. H. Rayson, R. R. Kramer, of Kramer, Dye, McNabb & Greenwood, Knoxville, Tenn. (William J. Turnblazer, Middlesboro, Ky., and Harrison Combs, Washington, D. C., of counsel), for United Mine Workers of America, et al.
 Before WEICK, Circuit Judge, and THORNTON and KENT, District Judges.
 WEICK, Circuit Judge.
 
 
 1
 In the District Court Osborne Mining Company, Inc., a Kentucky corporation, sought to recover compensatory and punitive damages from the United Mine Workers of America and United Mine Workers of America, District No. 19[1] alleging that the defendants induced and encouraged employees of neutral employers to engage in a concerted refusal in the course of their employment to mine and transport coal, for the purpose of forcing Osborne Mining Company to recognize and bargain with United Mine Workers of America as the representative of its employees; that U. M. W. had not been certified as the representative of Osborne's employees under the provisions of Title 29 U.S.C.A. § 159; that said Unions unlawfully interfered with its business of strip mining coal and purchasing coal from others for sale. It claimed that the conduct of the Unions was wilful and malicious and constituted a violation of Section 303 of the Labor Management Relations Act, 1947, 29 U.S. C.A. § 187(a) (1) and (2) and § 187(b) and also a violation of the common law of the State of Tennessee.
 
 
 2
 Love & Amos Coal Company was a Tennessee corporation engaged as a coal sales agency. It sold Osborne's coal on a commission basis of twenty-five cents a ton. It filed a separate action against the defendants to recover compensatory and punitive damages for interference with its coal selling business in consequence of the alleged wrongful acts of said defendants as aforesaid which violated the Labor Management Relations Act and the common law of Tennessee.
 
 
 3
 The two actions were tried together by the District Judge without a jury. The trial lasted over three weeks. The transcript of testimony comprises about 3600 pages and several hundred pages of exhibits. The Court adopted 124 Findings of Fact and 14 Conclusions of Law and found for Osborne Mining Company rendering a judgment in its favor for $165,000 compensatory damages and $50,000 punitive damages. The Court also found in favor of Love & Amos and rendered judgment for compensatory damages in the amount of $35,000.
 
 
 4
 The defendants have appealed from both judgments in Case Nos. 13,872 and 13,874. Osborne and Love & Amos have filed separate appeals in Case Nos. 13,871 and 13,873 claiming that the amounts of the judgments in their favor were inadequate.
 
 
 5
 We will first take up the appeals in Case Nos. 13,872 and 13,871 relating to the Osborne judgment. Many questions, chiefly factual, are presented by defendants. The facts of this case, as found by the District Judge, present a frightening picture of violence and intimidation. To better understand the questions presented a very brief outline of the area within which the acts took place is helpful.
 
 
 6
 Osborne's mines were located to the northeast of Jellico, Tennessee. The coal mined there was trucked into Jellico where it was unloaded at a coal tipple for shipment by rail to its ultimate destination.
 
 
 7
 The defendants first urge that they did not "induce or encourage" employees of an employer other than plaintiff to engage in "a concerted refusal" to compel plaintiff to bargain with U. M. W. in violation of Section 303 of the Act. They claim that the Jellico tipple was the primary situs of the labor dispute and that the activities complained of occurred at or in the vicinity thereof. Thus, any occurrences there are claimed to have been primary activity, and not secondary, so as not to be violative of Section 303. They rely on the decision of the Supreme Court in N. L. R. B. v. International Rice Milling Co., 1951, 341 U.S. 665, 71 S.Ct. 961, 962, 95 L.Ed. 1277.
 
 
 8
 It was undisputed that U. M. W. had not been designated as a representative of Osborne's employees under the provisions of Title 29 U.S.C.A. § 159.
 
 
 9
 In his findings of fact relating to this issue the Trial Judge found substantially as follows: Osborne, at the time of the grievances complained of, was engaged exclusively in strip mining and its employees performed the work incidental thereto. Osborne subleased part of its mining tracts to contractors who engaged in underground mining and sold the coal extracted therefrom to Osborne. These underground mine operators had their own employees. Osborne engaged truck owners, some of whom drove their own trucks while others had employees driving, to haul the coal produced from the strip and underground mining operations to the tipple which Osborne had constructed at Jellico. There was no common ownership between Osborne and the sublessee mine operators and the truck owners, and Osborne did not control them or their employees. Osborne had only two employees at the tipple.
 
 
 10
 Previous to the time of the grievances complained of, namely, in 1951, 1952 and 1953, Osborne was engaged in strip mining near Corbin, Kentucky. A district representative of District 19 attempted to induce Osborne to sign a collective bargaining agreement with U. M. W. at that time. When this failed, a picket line was established in 1953 at Osborne's place of business in Kentucky which drastically interfered with Osborne's business and also prevented independent truckers from hauling Osborne's coal. Osborne obtained a state court injunction restraining the picketing. The action was dismissed in November, 1953 by an order which recited that counsel for District 19 had advised the District that it was unlawful under Kentucky laws to picket for the purpose of obtaining a union contract unless the Union represented a majority of the employees and that the Union wished to obey the law by withdrawing pickets until such time as it became legal.
 
 
 11
 Clifford Osborne, President of the mining company, had been pressured on more than one occasion to sign a union contract and company employees had been solicited at their homes and at other places by the Union in an unsuccessful effort to get them to join the Union.
 
 
 12
 In 1954 Osborne secured new mining leases known as the Packard and Gatliff leases. The Packard lease comprised about 7,000 acres of land situated northeast of Jellico, Tennessee. The Gatliff lease involved 17,000 acres of land located in Whitley and Knox Counties, Kentucky, which adjoined the Packard tract on the east. Osborne started operations on its new leasehold in the early part of July, 1954. Shortly after operations commenced 20 to 30 Union men visited the strip pit of Osborne, which was the work situs of practically all of its employees, and asked the employees to join the Union. They told the employees that if they did not join the Union, they, the Union members, would return to the pit and the situation would not be peaceful.
 
 
 13
 On the morning of July 23, 1954, a riotous group of 50 to 100 men visited the Osborne tipple at Jellico. Two Union organizers, Taylor Maddox and Ed. Daniel were present. Maddox asked Osborne to sign a union contract. There was testimony to the effect that Maddox stated to Mr. Osborne that the Union members would take care of themselves and that the trucks would not dump their coal until Osborne signed the contract. While Maddox denied making this statement he did admit that he asked Osborne to sign the contract on this occasion and that he explained to Osborne why the men were there.
 
 
 14
 One unruly group attempted to stop a truck loaded with coal from entering Osborne's premises. The group blocked the path of the next truck and stopped it near the scale house. One or more of the group jerked the door of the cab of the truck and threatened the cab driver. Daniel failed to do anything to calm the men or disperse the group. Mr. Osborne requested the group to disperse and to permit the company to carry on its operations and he talked for some time with Maddox but was unsuccessful in his appeals to get the group dispersed.
 
 
 15
 A number of other trucks came into Jellico for the purpose of unloading coal at the tipple but could not gain access thereto because of the violent attitude of the group. The drivers, including the employee drivers, parked their trucks at various places on the streets and parking lots while Mr. Osborne was carrying on his conversation with Maddox and attempting to restore order.
 
 
 16
 Neither Maddox nor Daniel made any attempt to persuade the group to disperse so that coal could be unloaded. An unsuccessful attempt was made to obtain the help of the police.
 
 
 17
 Osborne's lawyer appeared and instructed the truck drivers to take their loads of coal to the company's tipple at Faber, Kentucky. The coal had been scheduled for shipment to the Tennessee Valley Authority but was shipped from Faber on some other order.
 
 
 18
 On the following day an injunction was obtained by Osborne and some of the truck drivers in the state court at Jacksboro, Tennessee, restraining riotous activities of the group of men. The suit was dismissed on December 19, 1956, after the Packard and Gatliff leases were surrendered by Osborne.
 
 
 19
 On August 2, 1954, as trucks of coal entered Jellico they were stopped by groups of men in the streets and the drivers were arrested by a deputy sheriff named Spencer Douglas, who was a member of the Union, on warrants charging them with operating trucks with improper equipment and without a Tennessee license. The charges against the drivers were dismissed by the General Sessions Court of Campbell County upon the statement of the prosecution witness that he was told by some one to swear out a warrant. The District Court said that this was a serious abuse of legal process inspired by Union activity. For a number of months thereafter crowds of men assembled around the tipple premises interfering with truck drivers as they came into the tipple. It was found that these activities interfered with plans of Osborne to secure a large number of subleases for underground operations on the new leasehold.
 
 
 20
 U. M. W. was attempting at the same time to organize other mines in the Jellico area. Its organizer Ed. Daniel sought to obtain a contract from the Maiden mine, 4 miles from Jellico. A picket line was placed at the pit. Daniel was observed driving from Jellico to the pit. A truck driver was hauling coal from the pit when two men in a car tried to stop him and fired pistol shots into his truck as he passed. The damage to the truck was repaired at Jellico where Osborne's drivers learned of the mine shooting incident.
 
 
 21
 On April 6, 1955, a group of two or three hundred men assembled at Jellico. They stopped trucks carrying coal into Jellico and dumped the coal in the streets and on the parking lots. They forced one of the employee drivers hauling coal to Osborne to dump his truck and the truck driver was assaulted by one or more of the riotous group. Another driver hauling Osborne coal was chased on foot through the Osborne tipple and his truck was dumped on a nearby lot by the mob. One or more members of the group forced an elderly truck driver to unload coal in the street by hand, although the truck was equipped with a mechanical dumping mechanism. Spencer Douglas who was a member of the group on July 23, 1954, was also a member of this group.
 
 
 22
 The group left Jellico and visited Newcomb, Tennessee, about four miles away, the site of the Boots and Cox Mine, also a non-union operation. Boots, a man of 65 years of age was severely beaten by the mob. Cox was also beaten and kicked. The mine was closed for about a week, when the operators called Daniel who came to their office and a contract was signed. The mine was reopened and Boots and Cox had no more trouble.
 
 
 23
 In February or March, 1955, two men went to the strip pit of Frost & Parrish near Newcomb and demanded that they sign a union contract. One of the men was armed. Mr. Frost told them he would talk only with Daniel. Shortly thereafter Daniel appeared and asked Frost if he wanted to sign a contract. Frost refused. On April 6th the same mob that had visited Jellico and the Boots and Cox mine visited the Frost & Parrish mine and assaulted both Frost and Parrish. They also attacked employees in the mine, leaving them prostrate in a muddy pool at the bottom of the pit.
 
 
 24
 Groups of men came into Jellico on April 7, 1955. The Board of Aldermen of Jellico passed a resolution requesting assistance from the Governor of Tennessee.
 
 
 25
 The mob visited the non-union Van Huss mine, between La Follette and Jellico, on April 11, 1955 where they attacked Van Huss and buried him under a pile of dirt. They forced his employees to beat and curse him. His clothes were stripped off and he was whipped and then thrown into a pool of water where he was doused up and down. One of his employees was treated in the same manner. Several months previously Daniel had tried to get Van Huss to sign a union contract. Lowe, a member of the mob, referred to Daniel.
 
 
 26
 As Clifford Osborne was driving to Jellico on April 13th, he saw a long caravan of cars approaching. He turned around and the cars at the head of the caravan chased him down the Cave Gap road into a hollow where they lost him. The men in the caravan searched the pit for Osborne and found no men working there, as they had fled into the woods.
 
 
 27
 Daniel, Maddox and another Union representative named Pass made union speeches in Jellico on April 11th. They urged their listeners to keep scab coal out of Jellico.
 
 
 28
 On April 28, 1955 several hundred men returned to Jellico and visited the place where the trucks that haul Osborne coal were kept overnight. They stood around pointing their fingers and evidencing a belligerent attitude toward the truck drivers assembled at the State Line Service Station. Daniel was seen talking to a group of men a short distance away. The men got in their car and proceeded to parade in front of the service station, driving their cars back and forth in an obvious effort to intimidate the onlooking truck drivers.
 
 
 29
 Groups of men continued to occupy the streets and sidewalks in front of the Osborne tipple during the ensuing months of 1955, until winter came. These groups would sometimes form picket lines, point their fingers, block the driveway and display hostility toward the truck drivers.
 
 
 30
 During April, 1955 and for months thereafter large numbers of nails were found on roads used by trucks hauling Osborne coal which roads were also used by miners going to the underground mines and strip pits. The District Judge found that the scattering of nails was inspired by union activities.
 
 
 31
 In the fall of 1955 and spring of 1956 other efforts were made to intimidate the truck drivers and stripping crews. These included the burning of haystacks at night in the plain sight of the stripping crew, shooting at a lone guard at the stripping pits, displaying of mysterious lights in the woods around the pits.
 
 
 32
 The Court concluded that the acts of violence and intimidation were intended to and did create a reign of terror in the Jellico area, in order to promote the U. M. W. organizing campaign; that said acts were intended to and did induce and encourage employees of employers (other than Osborne) to engage in a concerted refusal to mine and haul coal, the objective being to force Osborne to bargain with U. M. W. as the representative of its employees.
 
 
 33
 While the form of persuasion adopted in this case was not conventional, it is clear that the words of the statute (29 U.S.C.A. § 187a) "induce" and "encourage" include every form of influence and persuasion whether by appeals to reason or coercion with force and violence. International Brotherhood of Electrical Workers etc. v. N. L. R. B., 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L. Ed. 1299.
 
 
 34
 The activities of the defendants were not directed against a single neutral party as in N. L. R. B. v. International Rice Milling Co., 1951, 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, but to many neutral employers and their employees. They were designed to and did effect a concerted action on the part of the employees and neutral employers not to mine or haul coal for Osborne. Cf. Schauffler etc. v. United Association of Journeymen, 3 Cir., 1956, 230 F.2d 572, 574; N. L. R. B. v. Denver Building & Construction Trades Council, 10 Cir., 1952, 193 F.2d 421.
 
 
 35
 All but two of Osborne's employees were employed in the strip mines. It would seem clear that the labor dispute in this case involved the mining employees of Osborne and that the situs of the dispute was the pit where the miners were working and not at the coal tipple in Jellico, Tennessee, where only two of Osborne's employees were working.
 
 
 36
 In any event, the trial court found that U. M. W. did not confine its activities against the secondary employees to the tipple, or any picket line at those premises, but were spread throughout the area wherever the secondary employees could be found. The statute proscribes certain activities irrespective of where they take place. Even in picketing at the premises of a primary employer the union must exercise its rights consistent with the right of neutral employers to remain uninvolved in the dispute. Retail Fruit & Vegetable Clerks Union etc. v. N. L. R. B., 9 Cir., 1957, 249 F.2d 591; United Brick & Clay Workers of America v. Deena Art Ware, Inc., 6 Cir., 1952, 198 F.2d 637, 643.
 
 
 37
 In each of his findings of fact the trial court cited references to the record in support thereof.
 
 
 38
 This Court is bound by the findings of fact of the trial court unless they are clearly erroneous and it appears that the court has made a mistake. Rule 52 (a), Federal Rules of Civil Procedure, 28 U.S.C.A.; McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20; United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.
 
 
 39
 A review of the evidence with respect to this issue convinces us that the findings of fact of the trial court were not clearly erroneous.
 
 
 40
 U. M. W. contends that neither the truck drivers nor the sublessee mine operators were "neutral" employees within the meaning of the Act; that their relationship was not that of at arm's length which usually exists between employers and there was not a complete interdependence of operations. It relies chiefly on Local No. 24, International Brotherhood of Teamsters etc. v. N. L. R. B., 1959, 105 U.S.App.D.C. 271, 266 F.2d 675.
 
 
 41
 This is essentially a question of fact. As before stated, the trial court found that Osborne did not control either the secondary employers or their employees. The truck owners did not haul exclusively for Osborne.
 
 
 42
 While prior to the Taft-Hartley amendments of 1947, the employees of the lessee mine operators and truckers would have been considered as employees of Osborne (In the Matter of A. M. Greene, 49 N.L.R.B. 146), the effect of the amendments is not to so regard the employees of independent contractors, 29 U.S.C.A. § 152(3).
 
 
 43
 In the Teamsters case, supra, relied upon by defendants, the truck owners' (lessors') employees were deemed to be employees of the transportation company (lessee) because of the control exercised over them by the latter. The transportation company (lessee) was not an independent contractor. As stated by the court [105 U.S.App.D.C. 271, 266 F.2d 680]:
 
 
 44
 "The many tiny strands of Ace (lessee) control over these drivers cannot be extricated from the total fabric of mutual obligation. Those strands are clearly part of the pattern of the employer-employee relationship."
 
 
 45
 In the case at bar the strands of control referred to in the Teamsters case were not present, and the evidence supports the findings of the trial judge as to the existence of the independent contractor relationship.
 
 
 46
 Defendants assert that the District Court did not have jurisdiction to determine whether the evidence material to the federal cause of action also established a violation of the common law of Tennessee.
 
 
 47
 The case of United Mine Workers of America v. Meadow Creek Coal Co., 6 Cir., 1959, 263 F.2d 52, certiorari denied 1959, 359 U.S. 1013, 79 S.Ct. 1149, 3 L.Ed.2d 1038, supports the jurisdiction of the District Court to consider and determine the common law claim where it is joined with the federal claim and is supported by the same evidence. Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148. We are asked to reconsider our decision in Meadow Creek. We feel this case was correctly decided. Judge Martin in his opinion said [263 F.2d 60]:
 
 
 48
 "* * * We think that this case presents only a single cause of action; that the claim of secondary boycott and unlawful conspiracy are not separate causes of action, but merely different grounds to support a single cause of action."
 
 
 49
 The fact that the activities of U. M. W. were directed against both primary and secondary employers and employees does not oust the court of jurisdiction. The acts of the Unions were so interrelated that except in a very few instances it would be virtually impossible to separate those directed against a primary as distinguished from a secondary party. The primary activities could certainly not be regarded as an efficient intervening cause which would operate to relieve the defendants of responsibility for the full damage caused by their violation of federal law.
 
 
 50
 Defendants assert that the District Judge erred in admitting evidence of incidents taking place at other mines to establish the responsibility of defendants for incidents occurring at Osborne's operations. They cite Massengill v. Shadden, 48 Tenn. 357, as illustrative of the rule contended for. In that case, the Court held that evidence to the effect that the defendant had taken two horses from somebody else on the night in question did not establish that he had taken plaintiff's mare. In our case the factual situation is somewhat different.
 
 
 51
 The incidents concerning the other mines were in the area of Osborne's operations and were, as found by the trial court, in connection with U. M. W. efforts to organize all of the mines in the Jellico area. They were taking place at or about the time of the incidents directed against Osborne and the secondary employers and employees. In fact, in some instances, the same groups which committed acts of violence at Jellico left and committed acts of violence against other mine owners in the area.
 
 
 52
 Due to the close proximity of all of these mines to the Jellico tipple there can be no question that not only Osborne's employees, but also the secondary employers and employees knew all about the incidents occurring at the other mines. They might reasonably regard these incidents as an indication of what might happen to themselves if they persisted in mining or hauling coal for Osborne. Cf. N. L. R. B. v. Local 140, United Furniture Workers, 2 Cir., 1956, 233 F.2d 539; N. L. R. B. v. United Mine Workers of America, 6 Cir., 1952, 195 F. 2d 961. The incidents with respect to other mines constituted a form of influence and persuasion coming within the scope of International Brotherhood of Electrical Workers etc. v. N. L. R. B., 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299, and in our judgment the evidence was admissible.
 
 
 53
 We are of the opinion, however, that even without the evidence of the incidents at other mines, the judgments are supported by sufficient evidence.
 
 
 54
 We think the evidence supports the Findings and Conclusions of the District Judge that the defendants were responsible under the common law doctrine of respondeat superior for the acts of their agents and servants. United Construction Workers etc. v. Laburnum Construction Corp., 1954, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025; United Mine Workers of America v. Meadow Creek Coal Co., supra; Lewis v. Benedict Coal Corp., 6 Cir., 1958, 259 F.2d 346, 352; Brumley v. Chattanooga Speedway & Motordrome Co., 1917, 138 Tenn. 534, 198 S.W. 775.
 
 
 55
 The Court found that the group creating the reign of terror in the Jellico area was furthering the organizational efforts and interests of the International Union; that the Union organizers, Daniel and Maddox, were not only direct employees of District No. 19, but in fact and in law were representatives of the International; that Daniel and Maddox worked with the groups of men who created the reign of terror in the Jellico area and in so doing were furthering the interests of the International; that the defendants with full knowledge of the facts took advantage of these acts of violence to get new contracts and were benefited by the dues of new members; that the International encouraged and promoted the organizational efforts of District No. 19 and its representatives and members and advanced to it large sums of money during the period in question for these purposes; that it came to the aid of members of the mob and defended them in the criminal cases resulting from the mob's activities.
 
 
 56
 The Court also determined from the evidence that District No. 19 was not a separate autonomous body but a mere agent of the International Union. Cf. United Mine Workers of America v. Meadow Creek Coal Co., supra.
 
 
 57
 The evidence, in our judgment, was sufficient to establish liability on the part of the defendants for destruction of Osborne's business. The rule in United Brotherhood of Carpenters & Joiners of America v. U. S., 1947, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973, which interpreted Section 6 of the Norris-LaGuardia Act (29 U.S.C.A. § 106), does not immunize the unions from the activities shown here. There the court recognized that the grant of authority to an officer of a union to do certain things may well be sufficient to make the union liable and that "the custom or traditional practice of a particular union can also be a source of actual authorization of an officer to act for and bind the union." id., 330 U. S. at page 410, 67 S.Ct. at page 783.
 
 
 58
 The remaining question in the Osborne appeals relates to damages. The statute provides for the recovery of damages by whoever is injured by reason of the violation of Section 303(a). 29 U.S.C.A. § 187(b). Osborne claims that the award of compensatory damages was inadequate and asks this Court to increase the award. U. M. W. asserts that the award was excessive and that Osborne should recover only nominal damages or at least that a remittitur be ordered.
 
 
 59
 The trial judge awarded Osborne $165,000 for compensatory damages. He made findings of fact with respect to the following special items:
 
 
 60
 Damages paid T. V. A. for failure to fulfill
 contract .................................. $ 10,000.00
 Cancellation of Gatliff leases ............. 2,500.00
 Cancellation of Packard leases ............. 500.00
 Minimum royalty — Gatliff lease (1955) ..... 15,000.00
 Minimum royalty — Gatliff lease (1956) ..... 12,413.60
 Operating loss (1955) ...................... 9,454.03
 " " (1956) ...................... 39,365.52
 " " (1957) ...................... 14,234.09
 " " (1958 — 9 months) ........... 5,657.87
 ___________
 $109,725.11
 
 
 61
 Subtracting the total of the special damages from the award of $165,000 leaves a figure of $55,274.89 which can be said to be attributable to loss of profits during the five year period from 1955 to 1959.
 
 
 62
 To support the award for loss of profits the trial judge found that Osborne had an established business and that its net profits for the four year period from 1950 through 1953 for income tax purposes averaged $23,666.39 per year. The Court further found that except for the interference by defendants its profits for the five year period (1955-1959) would have been as great as in the preceding years (1954 was not considered a representative year).
 
 
 63
 Defendants attack the award of special damages as well as the profits. They claim that the evidence does not support the findings as to the special damages; that the Gatliff mine was not worked until 1956; that the failure to perform the T. V. A. contract was not attributable entirely to labor troubles; that Osborne had never produced sufficient coal to fulfill the T. V. A. contract prior to the labor trouble; that the workers employed by Osborne and the sublessees were paid substandard wages and that any contract entered into after November 25, 1944 would be subject to the Walsh-Healey Act (41 U.S.C.A. § 35 et seq.) which increased wages and reduced Osborne's profit thereby having the effect of removing T. V. A. as a possible customer; that the award of profits was too speculative; that Osborne's losses during the period in question were not entirely attributable to the labor dispute.
 
 
 64
 Osborne in its appeal claims that the trial court, because of its findings of fact, should have allowed it more compensatory damages. It asserts that the trial court should have increased its profits by eliminating expense deductions for depletion, depreciation, and bonus payments to officers and employees. These deductions were taken on its income tax returns and were apparently allowed by the Government. Osborne asks this Court to increase the award of compensatory damages.
 
 
 65
 The findings of the trial judge indicate the factors he took into account in allowing compensatory damages. He resolved many disputed issues of fact. It has not been demonstrated to us that the Court made any mistake in his findings of fact relating to damages or that he applied the wrong rule of law. We think that under all the facts and circumstances of the case the Court was justified in making the award which he did and we are not disposed to disturb it. The award of punitive damages was entirely within his discretion to make under the common law of Tennessee. United Mine Workers of America v. Meadow Creek Coal Co., supra.
 
 
 66
 In a tort action involving unliquidated damages the amount of which cannot be determined to a mathematical certainty, it is not the function of the Court of Appeals to retry the case or fix the amount of damages according to its notions, but rather to examine the record to determine whether there is substantial credible evidence to support the findings of the trial court. Atlantic Refining Co. v. Evans, 5 Cir., 1958, 251 F.2d 277. We would not be "justified in modifying them, unless satisfied that they are outside the range of permissible or same judgment." Adventures in Good Eating, Inc. v. Best Places to Eat, Inc., 7 Cir., 1942, 131 F.2d 809, 814.
 
 
 67
 In Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 250, 75 L.Ed. 544, the Court said:
 
 
 68
 "Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrong-doer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."
 
 
 69
 Profits are recoverable where there is an established business and they can be proven with reasonable certainty. Baumer v. Franklin County Distillery Co., Inc., 6 Cir., 1943, 135 F.2d 384; Roseland v. Phister Mfg. Co., 7 Cir., 1942, 125 F. 2d 417, 420, 139 A.L.R. 1013; Jennings v. Lamb, 1956, 201 Tenn. 1, 296 S.W.2d 828; Hagan v. Nashville Trust Co., 1910, 124 Tenn 93, 136 S.W. 993.
 
 
 70
 In the appeal filed in the Love & Amos case, No. 13,874, U. M. W. raised the important question as to whether the damages claimed by Love & Amos, not a party to the labor dispute, are too remote to be recovered under the Act. 29 U.S. C.A. § 187(A) (1) and (2) and § 187 (b).
 
 
 71
 The labor dispute, in this case, it will be recalled was solely between U. M. W. and Osborne. U. M. W. was engaged in efforts to organize Osborne's employees and in connection therewith violated the Act by activities directed against secondary employers and employees for which we have held it must respond in substantial damages to Osborne.
 
 
 72
 Love & Amos was a sales agency and the agent of Osborne. It was not a coal producer or operator. It had acted not only to procure leases for Osborne, but also sold the coal which Osborne mined for which it was paid a commission of 25¢ a ton. The agency agreement between Love & Amos and Osborne was verbal. It claims that in consequence of the violation of the Act by U. M. W. Osborne was unable to mine and transport the coal on orders procured by Love & Amos and it is, therefore, entitled to the commissions which it would have earned if the orders had been filled. The District Judge agreed.
 
 
 73
 Love & Amos had no employees whom U. M. W. was attempting to organize, or for whom it was endeavoring to secure a collective bargaining agreement; U. M. W. did not induce or encourage any of Love & Amos' employees to strike in order to compel Osborne to bargain with U. M. W.
 
 The Act provides:
 
 74
 "Whoever shall be injured in his business or property by reason of any violation of subsection (a) * * * may sue therefor in any district court of the United States * * *" 29 U.S.C.A. § 187(b).
 
 
 75
 No case interpreting this section on this point has been cited to the Court.
 
 
 76
 In Deena Products Co. v. United Brick & Clay Workers of America, 6 Cir., 1952, 195 F.2d 612, in a per curiam opinion, which dismissed an appeal because it was not timely filed, we were of the view that a parent corporation could not recover damages under the Act where its subsidiary was the primary employer and was involved in a dispute with a union which developed into a secondary boycott. There was no contract between the parent and subsidiary. In the present case there was a contract with Love & Amos.
 
 
 77
 In United Brick & Clay Workers of America v. Deena Art Ware, Inc., 6 Cir., 1952, 198 F.2d 637, we held that the Act conferred a right of action upon the primary employer as well as a neutral employer who was damaged by the prohibited boycott.
 
 
 78
 Judge Miller, who wrote the opinion for the Court, pointed out that the construction given to analogous provisions of the Sherman Anti-Trust Act (15 U.S. C.A. §§ 1-7) was pertinent citing Chattanooga Foundry & Pipe Workers v. City of Atlanta, 1906, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241, and other cases.
 
 
 79
 Defendants rely on cases interpreting the anti-trust laws in which damages claimed by third parties were deemed too remote to permit recovery. Melrose Realty Co., Inc. v. Loew's, Inc., 3 Cir., 1956, 234 F.2d 518, certiorari denied 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (non-operating owner-lessor of motion picture theatre with percentage lease.) This case followed the decision in Harrison v. Paramount Pictures, D.C.E.D.Pa.1953, 115 F.Supp. 312, affirmed 3 Cir., 1954, 211 F.2d 405. See also: Martens v. Barrett, 5 Cir., 1957, 245 F.2d 844 (sole stockholders of a corporation); Productive Inventions, Inc. v. Trico Products Corp., 2 Cir., 1955, 224 F.2d 678, certiorari denied 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (patentee who had granted exclusive license to another); Snow Crest Beverages, Inc. v. Recipe Foods, Inc., D.C.Mass.1956, 147 F.Supp. 907 (person having profitable relationship with party directly affected by violation of anti-trust laws).
 
 In Trico Products, supra, the court said:
 
 80
 "Those harmed only incidentally by anti-trust violations have no standing to sue for treble damages; only those at whom the violation is directly aimed, or who have been directly harmed may recover * * *. Shareholders and officers of corporations as well as creditors and landlords have been held not to have standing to sue for treble damages * * *. Undoubtedly, such persons suffer some financial loss when anti-trust violations are directed against the corporations in which they have an interest. But not every financial loss due to an anti-trust violation, however remote, gives a right of action." id., 224 F.2d 679.
 
 
 81
 Love & Amos rely on the cases of Congress Building Corporation v. Loews, Inc., 7 Cir., 1957, 246 F.2d 587, and Steiner v. 20th Century Fox Film Corp., 9 Cir., 1956, 232 F.2d 190, in which recovery was allowed to owner-lessors. It also relies on Chattanooga Foundry & Pipe Workers v. City of Atlanta, 1906, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241, where a purchaser of pipe directly affected by a conspiracy between pipe producers was permitted to recover.
 
 
 82
 In Congress Building and Steiner the lessees were parties to the conspiracy. In Chattanooga the conspiracy was directed at purchasers and plaintiff was one of the objects thereof.
 
 
 83
 In the present case, unlike the cited cases, Osborne was not a party to any conspiracy nor is there any claim that Osborne committed any wrong of any kind against Love & Amos. The theory of the complaint of Love & Amos against U. M. W. is that U. M. W. by its secondary boycotts destroyed Osborne's business and in consequence thereof Love & Amos were deprived of commissions which it otherwise would have earned under its contract with Osborne. In other words, U. M. W.'s violation of the federal law destroyed Osborne and Love & Amos were injured because of its contractual relations with Osborne.
 
 
 84
 For the wrongs which have been committed against Osborne, it has recovered compensation for all the damage to which it was legally entitled. It has been fully compensated for its actual losses and for the profits which it would have made. In addition, it has received an award for punitive damages.
 
 
 85
 Love & Amos contend that some of the activities of U. M. W. were directed at it; that the official journal of U. M. W., which was required reading at union meetings, contained critical articles with respect to the practice of T. V. A. in purchasing what it called non-union coal; that the malice which U. M. W. had toward Osborne was intensified in its attitude toward Love & Amos because of that concerns long relationship as the chief source of coal for T. V. A.; that statements were made on the picket line or on placards carried by the pickets which mentioned Love & Amos or which made disparaging remarks concerning Mr. Amos, individually, who was an officer of Love & Amos and also a principal of Osborne.
 
 
 86
 The unions explain that they were interested in the wages and working conditions of the miners. They were conducting an organizational campaign. They had the right of free speech which included the right to criticize an agency of Government for awarding public contracts at prices which they claim did not permit the payment of fair wages to miners and resulted in substandard working conditions. They claim they had the right to display signs or placards so long as they told the truth.
 
 
 87
 In any event, it is not for these acts that Love & Amos seek recovery here. As heretofore pointed out Love & Amos' cause of action is based upon the destruction of Osborne's business by the unlawful activities of the unions and the damage it claims to have suffered is because of its contractual relationship with Osborne. This damage is incidental and too remote for recovery under federal law.
 
 
 88
 If Love & Amos were damaged as a result of any activities of defendants directed at it, an adequate remedy exists under state law. This is not the type of case contemplated by the Labor Management Act of 1947.
 
 
 89
 Jurisdiction cannot be sustained on the ground that, Love & Amos having failed in their federal cause of action, the District Court may nevertheless retain the case and administer the cause of action under the common law of the state. Cf. Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148; Baltimore Steamship Co. v. Phillips, 1927, 274 U. S. 316, 47 S.Ct. 600, 71 L.Ed. 1069; United Mine Workers of America v. Meadow Creek Coal Co., 6 Cir., 1959, 263 F.2d 52.
 
 
 90
 The failure of Love & Amos to recover here is not attributable to lack of supporting evidence. It was because it never had and could not assert any federally recognized cause of action or ground for recovery. Consequently, the analogy in Apex Hosiery Co. v. Leader, 1940, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, applies. Hunt v. Crumboch, 1944, 325 U.S. 821, 826, 65 S.Ct. 1545, 89 L.Ed. 1954. The District Court had no jurisdiction of the Love & Amos action for violation of the common law of Tennessee.
 
 
 91
 The only question raised by Love & Amos in Case No. 13,873 is that the amount of the judgment in its favor was inadequate. Since we have reversed its judgment in Case No. 13,874, this disposes of the question of damages.
 
 
 92
 It follows that the judgment in Case No. 13,872 is affirmed; judgment in Case No. 13,871 is affirmed; judgment in Case No. 13,874 is reversed and the cause is remanded to the District Court with instructions to dismiss the complaint and the appeal in Case No. 13,873 is dismissed.
 
 
 
 Notes:
 
 
 [1]
 The Unions will be referred to herein either as defendants, U. M. W. or District No. 19. Osborne Mining Company, Inc., will be referred to as plaintiff or Osborne and Love & Amos Coal Company as Love & Amos