TRUCK DRIVERS AND HELPERS LOCAL UNION NO. 728, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Appellant,

v.

EMPIRE STATE EXPRESS, INC., Appellee.

No. 18582.

United States Court of Appeals Fifth Circuit.

July 7, 1961.

John S. Patton, Wm. B. Paul, Poole, Pearce & Hall, Atlanta, Ga., for appellant.

Robert T. Thompson, Atlanta, Ga., W. Edward Swinson, Swinson, Elliott & Schloth, Columbus, Ga., Wilson, Branch & Barwick, Atlanta, Ga., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

This is a suit under Section 303 of the National Labor Relations Act, 29 U.S.C.A. § 187. That statute gives a cause of action for damages to a party injured by a "secondary boycott," described in the same language as that employed in Section 8(b) (4) of the Act, 29 U.S.C.A. § 158(b) (4),[1] which declares the "secondary boycott" an unfair labor practice. Section 303 provides in part:

"(a) It shall be unlawful * * * for any labor organization * * * to induce or encourage the employees of any employer to engage in, a strike * * * where an object thereof is—

"(1) forcing * * * any employer * * * to cease using, selling, handling, transporting * * * or to cease doing business with any other person;

"(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the

1. Subsequent to the initiation of this litigation, §§ 8(b) (4) and 303 were amended by the Landrum-Griffin Act, Sept. 14, 1959, Pub.L. 86–257, 73 Stat. 525, 542, 545.

representative of his employees
\* \* \*."

It was alleged that Local 728 induced the employees of the Service Cartage Company to strike, the object being to force Service to cease doing business with Empire State Express, Inc., and/or to force Empire to recognize Local 728.

The undisputed facts out of which this controversy grew are these. Prior to August 1, 1955, there existed in the State of Georgia an over-the-road truck line known as ACA Motor Lines, Inc. (hereinafter referred to as ACA). ACA's territory embraced a number of communities south and southwest of Atlanta, its northern terminus and its headquarters. In Atlanta, ACA collected freight from local shippers and distributed to local consignees itself. In the terminology of the trade, ACA performed its own cartage work. This freight was brought to ACA's terminal and loaded in its trailers for shipment south to the communities it serviced.

ACA went out of business and sold its franchise and some of its equipment to Empire, which began operations on August 1, 1955. The owners of Empire, Rowlenson and Livingston, decided not to have their company engage in cartage operations in Atlanta. Instead, they entered into a contract with Service Cartage Company, a partnership composed of Viness and Busby, whereby Service agreed to handle the collection and delivery of Empire's freight in Atlanta. Under this agreement, Service was, *inter alia*, to maintain a terminal in Atlanta to serve as a collection and distribution center for freight carried by Empire. All of Service's employees were former employees of ACA for whom they had performed similar services. Thus, it could be said that Empire succeeded to ACA's over-the-road operations, and Service to ACA's local cartage operations in Atlanta.

Empire decided to base its operations in Columbus, Georgia. This gave rise to the problem of what to do about five over-the-road drivers domiciled in Atlanta who were former employees of ACA. Empire's owners wanted these drivers to move to Columbus as soon as possible. In the meantime, they were to work out of Atlanta driving Empire's trucks south. While based in Atlanta, these drivers were to be dispatched by Mr. Viness of Service.

On August 26, 1955, these five drivers refused to drive the trucks from the Atlanta terminal because they claimed the equipment was unsafe.[2] The following day Empire sent other employees from Columbus to Atlanta to move the trucks. The five over-the-road drivers never returned to work, although they appeared at the Atlanta terminal from time to time. They were never given notice of discharge and nobody was hired to replace them.

The five over-the-road drivers were members of Local 728. On July 28, 1955, prior to Empire's commencing operations, an official of the Local had contacted Empire requesting that Empire recognize 728 as the exclusive bargaining representative for these five drivers.[3] The issue was discussed but not resolved at that time. On August 29, an official of Local 728 again contacted Empire in regard to signing a contract recognizing the Local as the exclusive bargaining agent for the five Atlanta-based drivers. Empire replied that it had no over-the-road drivers belonging to Local 728, "because of what took place" on August 26. "[T]hey refused to work and \* \* \* any time anyone refused to work and operate and do that which they were told to do, they automatically quit and left our employ."[4] On Septem-

---

2. On August 23, the trucks had been removed to Columbus for inspection and repairs following a complaint to the ICC that the equipment was defective.

3. ACA had adhered to the Southeastern Area Over-The-Road Motor Freight Agreement, though it was not a party to a collective bargaining agreement with Local 728.

4. This latter statement, a reiteration of his earlier position, was made by Rowlenson on the day the picketing commenced

ber 9 or 10th, Empire made explicit its refusal to recognize Local 728.[5] On September 13, Local 728 established a picket line at the Atlanta terminal. The pickets carried signs stating that the Local was on strike against Empire State Express.[6] As the picketing began, a representative of Local 728 told the employees of Service to go out on strike, which they did.

Out of these facts the present suit arose. Plaintiff complained, as noted above, that Local 728 induced the employees of Service to strike, the object being to force Service to cease doing business with Empire and/or to force Empire to recognize the union.

Local 728's principal defense was that Empire did not occupy the status of "any other person" within the meaning of Section 303(a) (1), and Service was not

"any other employer" within the meaning of Section 303(a) (2). It relied in the main on the following facts.

The telephone in the Atlanta terminal, though paid for by Service, was listed in the name of Empire. There was no Atlanta telephone listing for Service. The phone was on a number of occasions answered "Empire State Express." One of the local drivers testified that, "when I walk in the building [of a prospective shipper] I say, 'Have you got anything for Empire State Express.'" There were no signs on the terminal indicating that it was the terminal of either Service or Empire. Both Empire and Service distributed to shippers printed circulars which advertised the Atlanta terminal as that of Empire and made no mention of Service. Practically all the freight handled by Service was for the account

(September 13, 1955). Empire's view that the drivers were no longer "employees" of Empire following their concerted refusal to drive the trucks on August 26 seems to reflect an erroneous view of the law. Section 101(3) of the Taft-Hartley Act, 29 U.S.C.A. § 152(3), provides that: "The term 'employee' shall include * * * any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute * * * and who has not obtained any other regular and substantially equivalent employment * * *." "The term 'labor dispute' includes any controversy concerning the terms or conditions of employment * * *." 29 U.S. C.A. § 113(c). See N. L. R. B. v. Good Coal Co., 6 Cir., 1940, 110 F.2d 501. The physical condition of the trucks which they were to drive would seem to have been a "condition of employment" of the drivers over which there could be a labor dispute within the meaning of the Taft-Hartley Amendments. If this view is accepted, the over-the-road drivers would appear to have been "employees" of Empire within the meaning of the Act until they obtained "regular and substantially equivalent employment."

The District Court in the case at bar charged the jury in accordance with the foregoing analysis.

"In that connection I charge that if you find that the five drivers of Empire State Express who worked out of the terminal of Service Cartage Company in Atlanta ceased to work as a consequence of, or in

connection with, any current labor dispute and had not obtained any other regular and substantially equivalent employment at the time the picketing began on September 13, 1955, said drivers were, on said date, employees of the plaintiff, Empire State Express, Inc.

"And I charge you further that if two or more employees ceased work because of a dispute over working conditions in their employment such employees ceased work because of a current labor dispute and, therefore, if you find that the five over-the-road truck drivers ceased work because of dispute over the condition of the equipment they were required to drive, you will find that they ceased work over a labor dispute."

5. No. 26 of the "Admissions Made by Defendant in the Pleadings" reads:
"At all times material to this action, Defendant Local Union has demanded of Empire State Express, Inc., that it recognize Defendant Local Union as collective bargaining representative of the employees of Empire State Express, Inc., and that it was not until about September 9 or 10, 1955, that Empire State Express, Inc. refused to recognize Defendant Local Union as collective bargaining agent of the employees of Empire."

6. The business agent testified on the purpose of the picketing as follows:
"A. It was to—our attempt to force the company to recognize us and reinstate these people on the job, yes."

of Empire.[7] Service owned five trucks (three tractors and two van-type trucks). In addition, it used one van-type truck owned by Empire, which was loaned to Service without charge. None of these six trucks bore an inscription which would indicate their owner or operator. At times, however, Service's tractors hauled trailers which bore Empire's name. All freight payments went directly to Empire, and Empire paid Service at the rate of 25 cents per hundred weight for all freight handled by it. The five over-the-road drivers of Empire domiciled in Atlanta received their instructions from Jack Viness, co-owner of Service, from August 1 until they struck on August 26. The log books and time records of these drivers were delivered to Viness who mailed them to Columbus, and the checks for these drivers were mailed from Columbus to Viness, who distributed them at the Atlanta terminal. Finally, there was uncontradicted testimony that Viness had some authority as to the settlement of grievances relating to the five over-the-road drivers.[8]

The District Court charged the jury that:

> "It contends, however, that Empire and Service are not separate companies. In addition to the defendant's contentions as I read to you from its answer in this case, it contends that Empire and Service were one company, or in effect one company, or substantially the same company; that Service is part and parcel of Empire; that Service is actually an arm of Empire, and that Service is an ally and alter ego and an agent of Empire, and the defendant union says that the picketing was primary picketing and not secondary picketing.
>
> \* \* \* \* \* \*

> "It becomes important that we understand what the law means by 'agent' and 'agency', and what it means by 'independent contractor'.
>
> \* \* \* \* \* \*

> "Now as to the relationship between Empire and Service, if Service Cartage Company was merely an agent of Empire it would not be a separate, independent person, and you would find for the defendant.

> "If, however, Service Cartage Company was not an agent but an independent contractor with Empire you may find that the necessary separateness and independence exists. The business relationship usually and ordinarily existing between one company and an independent contractor with such company, by reason of one company being an independent contractor with the other, will not destroy or prevent the necessary separateness and independence between the two companies and will not prevent the two companies from doing business with each other within the meaning of the Act.

> "The essence of a secondary boycott is that its sanctions or pressures bear directly, not alone upon the employer who alone is a party to the labor dispute, but directly upon some third party who has no concern in it. \* \* \*
>
> \* \* \* \* \* \*

> "Insofar as the terms 'agent, agency, neutral, neutrality, ally, alter ego' and 'independent contractor' are concerned the test boils down to this: are the two enterprises the same? If they are the same then the terms of the statute 'any other person' in the phrase 'to cease doing business with any other person' and the terms 'any other employer' in the phrase 'forcing or requiring any other em-

---

7. Empire admitted that "Service Cartage Company handled only a very small amount of incoming or outgoing freight for any other carrier besides Empire State Express, Inc. from August 1 to September 13, 1955, and that said freight handled was almost negligible."

8. See text following the reference to footnote 11, infra.

ployer to recognize or bargain with a labor organization' are not met. That is, if the two enterprises are the same.

"If the two enterprises, however, are not the same then these particular terms of these statutes are met.

\* \* \* \* \* \*

"In determining whether any person is acting as an agent of another person so as to make such other person responsible for his acts, the question of whether specific acts performed were actually authorized or subsequently ratified shall not be controlling.

"An independent contractor is one who is exercising an independent employment contracts (sic) to do certain work according to his own methods and without being subject to the control of his employer, except as to the result of his work.

"An independent contractor is one who carries on an independent employment in pursuance of a contract by which he has entire control over the work and the manner of its performance.

"One who contracts to do specific work, furnishing his own assistants and executing the work in accordance with either entirely his own ideas or a plan previously given to him by the person for whom the work is done, without being subject to the orders of the latter with respect to the details of the work, is an independent contractor.

"The important test in determining whether a person employed to do certain work is an independent contractor or a mere agent is the control over the work which is reserved by the employer. Whether one is an

independent contractor depends upon the extent to which he is, in fact, independent in performing the work."

We think the crucial part of this charge is the summary:

"Insofar as the terms 'agent, agency, neutral, neutrality, ally, alter ego' and 'independent contractor' are concerned the test boils down to this: are the two enterprises the same? If they are the same then the terms of the statute 'any other person' in the phrase 'to cease doing business with any other person' and the terms 'any other employer' in the phrase 'forcing or requiring any other employer to recognize or bargain with a labor organization' are not met. That is, if the two enterprises are the same.

"If the two enterprises, however, are not the same then these particular terms of these statutes are met."

Here, the court brought together all of the vague doctrines it was expounding to the jury and summarized them in one succinct phrase, "are the two enterprises the same?"

This is an area where precise delineation is extremely difficult.[8a] Yet, we think the jury must have been misled when it was told that the defense was grounded in the fact that Service and Empire were the "same." Local 728's position was more intricate than that, as will become clear from the ensuing discussion. Courts have found employers were "allied" so as to deprive them of the protection of the secondary boycott proscriptions in cases where the primary and secondary employer were not commonly owned,[9] and where they performed different services.[10] In neither of these situations could the two employers be said to have been the "same." In the case

**8a.** See Local 761, International Union of Electrical Radio and Machine Workers, A.F.L.–C.I.O. v. N. L. R. B., 1961, 81 S. Ct. 1285.

**9.** See Local No. 24, International Brotherhood of Teamsters, etc. v. N. L. R. B., 1959, 105 U.S.App.D.C. 271, 266 F.2d

675. See also, National Labor Relations Board v. Local No. 728, International Brotherhood of Teamsters, etc., 5 Cir., 1956, 228 F.2d 791, 797.

**10.** General Drivers, etc. v. American Tobacco Co., Ky.1953, 258 S.W.2d 903.

at bar, Empire and Service had different names. Could that be enough to render them not the "same"? Although the example may be somewhat facetious, it points up the difficulty inherent in the use of the word "same."

■ Local 728's first argument in defense was that Service was the "agent" of Empire. 29 U.S.C.A. § 152(2) provides that "the term 'employer' includes any person acting as an agent of an employer, directly or indirectly * * *." If Service was the agent of Empire within the meaning of the Act, then Empire could not have been "any *other* person" or "any *other* employer" within the meaning of Section 303. (Emphasis added.) Certainly, Service was the agent of Empire for some purposes. It was Empire's agent for receiving freight consigned to Empire, for soliciting freight for Empire, for receiving telephone calls for Empire. The pertinent question here is whether Service was Empire's agent with regard to Empire's labor relations with the five over-the-road drivers temporarily stationed in Atlanta.[11] Cook, President of Local 728, testified, without contradiction, that:

"A. Yes, sir. During the—I think it's the first part of August or the middle of August, Mr. Mathis was assigned to that company and he was on vacation and the drivers complained to me on run-arounds and also where lessees had been running in their place.

"Q. What is meant by 'run-arounds'?

"A. Run-arounds is (sic) where a company will dispatch a junior driver out ahead of a senior driver, and I went to Service Cartage Com-

pany and Empire State Express on these particular grievances and talked to Mr. Viness, and Mr. Viness called Columbus. We got some of the problems out of the way.

"Q. You say 'we,' who do you mean?

"A. Mr. Viness and myself, in reference to the lessees running instead of the regular drivers who we represented. He said they would generally run out of Columbus, and he called Columbus himself. It was late in the afternoon or the early evening, probably around six or seven o'clock, and I think he got Mr. Rowlenson on the phone and it was discussed briefly and he advised me at that time that he had a meeting set up with Mr. Mathis whenever he got back into town and he would work it out at that time, *whatever the problems were that we were unable, Mr. Viness and myself, to settle.*" (Emphasis supplied.)

Plaintiff's witness Viness testified that on August 26, the day the five over-the-road drivers refused to work, he called Local 728. The Local sent a man over to inspect the vehicles. Viness conferred with him about the refusal of the men to drive as several of them appeared to be under the influence of alcohol. Furthermore, Empire admitted that Viness dispatched and gave instructions to the five over-the-road drivers from August 1–August 26.[12] Mr. Rowlenson, an owner of Empire, summarized the role Viness played vis-a-vis the over-the-road drivers in the following testimony:

"Q. Mr. Rowlenson, during the period of time that the five over-the-road drivers who formerly worked

---

11. Cf. National Labor Relations Board v. Condenser Corp., 3 Cir., 1942, 128 F.2d 67, 71.

12. "[Admission] 54. Beginning August 1, 1955 and continuously until August 26 or 29, 1955, the five (5) over-the-road drivers of Empire who were domiciled in Atlanta, Georgia, were dispatched from the Atlanta Terminal of Service Cartage

Company by Jack Viness, who was connected with and employed by Service.

   *    *    *    *    *

"[Admission] 60. Empire State Express, Inc. admits that the five (5) over-the-road drivers of Empire domiciled in Atlanta for a period from August 1 to August 26 or 29, 1955, received their instructions from Jack Viness of Service Cartage Company."

for ACA were working for you and before this work stoppage occurred, did they ever receive any instructions or direction from Columbus?

"A. Little or none. They received their instructions from Mr. Viness as was pre-arranged."

Local 728's second theory was that Service was an "ally" of Empire in the labor dispute. The "ally" doctrine had its origin in Douds v. Metropolitan Federation of Architects, etc., D.C.S.D.N.Y. 1948, 75 F.Supp. 672. It was approved and expounded upon in considerable detail in National Labor Relations Board v. Business Mach. & Office A., etc., 2 Cir., 1955, 228 F.2d 553, 558. Both cases held that the kind of secondary activity outlawed by the Taft-Hartley Act did not encompass "union activity designed to prevent employers from doing the farmed-out work of a struck employer." This was the rule at common law. Iron Molders' Union, etc. v. Allis-Chalmers Co., 7 Cir., 1908, 166 F. 45, 51, 20 L.R.A., N.S., 315. Insofar as the "ally" doctrine is limited to "struck word" situations, we find it inapplicable to the facts of this case.[13]

The difficulty with the test of whether the two enterprises are the same, as propounded by the district court to the jury, is that that test in its ordinary application is very different from what it should properly mean for purposes of this proceeding. For example, in Local No. 24, International Brotherhood of Teamsters, etc. v. N. L. R. B., 1959, 105 U.S.App.D.C. 271, 266 F.2d 675, 680, the D. C. Circuit agreed with the contentions of the union as thus described by the trial examiner:

"Rather, the Respondents [our petioners] say, the businesses of the Lessors and ACE are so integrated operationally that for the purposes of this proceeding they must be deemed either a single employer, a joint or common venture, a 'straight line' operation within the Board's understanding of that term, or an alliance of interest. The Respondents maintain that whichever term may best be used to describe the relationship among ACE and the Lessors, their business arrangements are such that in the Union's dispute with the Lessors or any one of them neither ACE nor any of the Lessors is so unconcerned therewith that it is statutorily shielded as a neutral from an extension of the dispute by the Union to its operations, and, therefore, the Union's picketing and inducement herein occurred at premises which in this proceeding should be regarded as primary and not secondary."

Chief Judge Prettyman, speaking for the D. C. Circuit, said:

"The answer to the problem before us cannot be reached by the use of any legalistic word or phrase, such as 'co-employer', or 'independent contractor', or even 'ally'. It cannot be solved by the strict application of the technicalities which adhere to such legal terms. * * *

"It is our view that the relationships of ACE, these drivers, and the lessor-owners are so intertwined with respect to employment that ACE was not protected by the statute against the impact of a strike by the drivers against the lessor-owners. The many tiny strands of ACE control over these drivers cannot be extricated from the total fab-

13. "Common ownership and control" among the struck employers has been accepted as a defense to a charge of illegal secondary boycott. See Administrative Decision of NLRB General Counsel, 1953, Case No. 806; Teamsters Local 20, 1956, 115 NLRB 1290 at note 5. In such situations the employers are often termed "allies." See Hawaii Teamsters Local 996, 1955, 111 NLRB 1220.

The "common ownership and control" test was criticized in Alpert v. United Brotherhood of Carpenters, etc., D.C.D. Mass.1956, 143 F.Supp. 371, 376, note 2.

The "common ownership and control" defense was rejected in Bachman Machine Co. v. N. L. R. B., 8 Cir., 1959, 266 F.2d 599. See also J. G. Roy & Sons Co. v. N. L. R. B., 1 Cir., 1958, 251 F.2d 771.

ric of mutual obligation. Those strands are clearly part of the pattern of the employer-employee relationship.

"As we pointed out in Seafarers International Union, etc. v. N. L. R. B.,[6] this section (8(b) (4) (A) and (B)) cannot be read or applied literally; it must be construed. Of course, in an area so wide as is the field of labor relations, there are many situations in which the answer to a dispute under this section is easily derived by the application of such legalistic formulae as 'independent contractors', 'co-employers', or 'allies'. But it is equally clear that there is a zone of dispute in which such formulae are useless, and the answer must be derived by applying the intent of the statute to the facts in the case. This is such a case. We need not devise a new word to describe the relationship here depicted.

"[6] 105 U.S.App.D.C. 211, 265 F.2d 585 (1959)." [14]

■ We turn, then, to the intent of the Statute. At first the scope of Sections 8(b) (4) and 303 of the Taft-Hartley Act was extremely imprecise. "This provision could not be literally construed; otherwise it would ban most strikes historically considered to be lawful, so-called primary activity." [15] The legislative history indicates the kind of secondary boycotts at which Sections 8(b) (4) and 303 were directed.[16] The sponsor of the legislation, Senator Taft, stated that: "This provision makes it unlawful to resort to a secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees." [17] He later noted that: "The secondary boycott ban is merely intended to prevent a union from injuring a third person who is not involved in any way in the dispute or strike, and therefore should not suffer economic damage simply because of the action of a labor organization. It (the secondary boycott ban) is not intended to apply to a case where the third person is, in effect, in cahoots with or acting as a part of the primary employer." [18] The requirement that the secondary employer be a "neutral" is firmly established in the case law. "As we understand this statute [8(b)–(4) (A)] there are two necessary requirements to find a violation of it. These are: (1) Independent *neutral employers* * * *, and (2) the union must have as an object of its picketing (or other activity) the inducement or encouragement of the *neutral employees* to engage in a concerted refusal to work for their *neutral employer,* so that the neutral employer will cease doing business with the *primary employer* * *." [19]

14. Compare United Mine Workers v. Osborne Mining Co., 6 Cir., 1960, 279 F.2d 716, 724.

15. Local 761, International Union of Electrical, Radio and Machine Workers, A.F.L.–C.I.O. v. N. L. R. B., 1961, 81 S. Ct. 1285, 1288. See 60 Yale Law Journal 684.

16. National Labor Relations Board v. Denver Building Council, 1951, 341 U.S. 675, 686, 71 S.Ct. 943, 95 L.Ed. 1284. See National Relations Board v. Business Mach. & Office A., etc., 2 Cir., 1955, 228 F.2d 553; Oil Workers International Union & Pure Oil Co., 84 NLRB 315.

17. 93 Cong.Rec. 4323.

18. 95 Cong.Rec. 8709.
That Section 8(b) (4) is aimed at protecting neutral employers is repeatedly emphasized in the legislative history of the Landrum-Griffin Act which amended the secondary boycott provisions. See Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, 474, 808, 838, 976, 1197, 1386, 1499, 1519, 1580.

19. Retail Fruit & Vegetable Clerks Union, etc. v. National Labor Relations Board, 9 Cir., 1957, 249 F.2d 591, 594. See also, Local 1976, United Brotherhood of Carpenters' etc., Union v. National Labor Relations Board, 1958, 357 U.S. 93, 100, 78 S.Ct. 1011, 2 L.Ed.2d 1186; National Labor Relations Board v. International Rice Milling Co., 1951, 341 U.S. 665, 670–671, 71 S.Ct. 961, 95 L.Ed. 1277; J. G. Roy & Sons Co. v. National Labor Relations Board, 1 Cir., 1958, 251 F.2d 771, 772; Douds on Behalf of N. L. R. B. v. Sheet Metal Workers Internat'l Ass'n, D.C.E.D. N.Y.1951, 101 F.Supp. 273, 277.

The situation prior to August 1, 1955, when ACA was in existence is revealing. At that time the current employees of Service who are engaged in local cartage were employees of ACA, doing the same work. The five over-the-road drivers were also employees of ACA, performing the identical services they subsequently performed for Empire. Had the over-the-road drivers struck when ACA was in existence, it is clear that if they had induced a strike by their fellow employees who were engaged in the local cartage operations there would not have been an illegal secondary boycott. This would be true because no employees of "any other employer" had been induced to strike. In what way, if any, did events subsequent to July 31, 1955 convert what would not have been illegal prior to that date into a proscribed secondary boycott? ACA was split in two. The over-the-road drivers were now technically the employees of Empire, while the local employees worked for Service Cartage Company.[20] The economic fortunes of the two companies were as inextricably interwoven as they were when both entities were ACA and Mr. Viness of Service still retained general supervision of the over-the-road drivers of Empire.

This latter fact is important not so much to show that Viness was technically the "agent" of Empire, as to illustrate the close relationship between the two companies. In supervising these drivers, Viness was exercising a management function of Empire. He ceased to exercise that function only when there were no longer any drivers to supervise, and not because he was disinclined to serve as supervisor, nor because Empire wished that he no longer do so. Insofar as Empire and Service were concerned, they were satisfied to have Viness continue as he had. Empire would argue to the contrary, pointing out that Viness's authority to dispatch these drivers was expressly revoked. This revocation, however, came after the over-the-road drivers refused to drive, when there was no one for Viness to supervise. And once the strike began, and it began when the drivers refused to drive, the employer could not make a change in form which would deprive the strikers of the right to call on their fellow drivers to support their action.[21]

The immediately preceding economic history of the two companies, plus the fact that nearly all of Service's business was with Empire,[22] plus the fact that the over-the-road drivers were generally supervised and dispatched by Viness, establishing an overlapping of management functions between Service and Empire, convinces us that Service was not the unconcerned, neutral employer whom Sections 8(b) (4) and 303 of the Taft-Hartley Act were designed to protect, and, thus, that Empire was not the victim of an illegal secondary boycott. The district court erred in denying the defendant's motion for a directed verdict and its motion for judgment notwithstanding the verdict. The judgment is therefore reversed and the cause remanded with directions to enter judgment for the defendant.

Reversed with directions.

---

20. The drivers who worked out of the Atlanta terminal were not at all clear on who their employer was. One of the local drivers (supposedly an employee of Service) testified as follows:

"Q. Bishop, where are you employed? A. Well, I work, I guess it is Empire State.

"Q. Well, who pays you? A. Jack Viness pays me."

Benefield, one of the striking over-the-road drivers, testified:

"Q. Do you know of your own knowledge who owns Service Company? A. I didn't even know there was a Service Cartage Company.

"Q. When did you first learn, if you did, that there is a company called Service Cartage? A. When we came out on strike."

21. Cf. Seafarers International Union, etc. v. N. L. R. B., 1959, 105 U.S.App.D.C. 211, 265 F.2d 585 (Prettyman, J.).

22. See United Mine Workers of America v. Osborne Mining Co., 6 Cir., 1960, 279 F. 2d 716, 724.