Cecil L. KINTY, d/b/a Kinty Trucking
Company, Appellee,

v.

UNITED MINE WORKERS OF
AMERICA, Appellant.

Ruth M. KITTLE, Individually and as Administratrix with will annexed of the Estate of Bertsell Kittle, Deceased, Appellee,

v.

UNITED MINE WORKERS OF
AMERICA, Appellant.

Thomas J. GATES, d/b/a Dorothy Coal
Company and Gates Trucking
Company, Appellee,

v.

UNITED MINE WORKERS OF
AMERICA, Appellant.

Lawrence LAYMAN, d/b/a Layman Coal
Company, Appellee,

v.

UNITED MINE WORKERS OF
AMERICA, Appellant.

Josephine LACARE, widow of original
plaintiff Orlanda LaCare, et
al., Appellees,

v.

UNITED MINE WORKERS OF
AMERICA, Appellant.

Nos. 75–1462—75–1466.

United States Court of Appeals,
Fourth Circuit.

Argued March 3, 1976.

Decided Oct. 21, 1976.

Willard Owens, Washington, D. C. (Harrison Combs, Steven B. Jacobson, Washington, D. C., Ellen P. Chapnick, Washington, D. C., and Michael Tomasky, Morgantown, W. Va., on brief), for appellant.

John A. Rowntree, Knoxville, Tenn. (Fowler, Rowntree, Fowler & Robertson, Knoxville, Tenn., Charles G. Johnson, Clarksburg, W. Va., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and BUTZNER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge.

The defendant United Mine Workers of America (UMW) appeals from five judgments, entered after jury verdicts, in actions alleging damages arising out of a "secondary boycott" on the part of the UMW in violation of § 187, 29 U.S.C.[1] The five actions in which judgments were entered were among twelve similar actions begun against the defendant. Because liability in all the cases rested on the same general factual background, with a great mass of testimony common to all the cases, the actions were consolidated for trial. Prior to trial, two of the plaintiffs however, voluntarily dismissed, leaving ten cases remaining for trial. Following a jury trial, verdicts were equally balanced in favor of the defendant and the plaintiffs, the defendant prevailing in five cases and the plaintiffs in five.[2] The plaintiffs in the cases in which the verdicts were in favor of the defendant have not appealed from the judgments entered on the basis of such

[1] 29 U.S.C. 187 is as follows:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section [8(b)(4) of the National Labor Relations Act, as amended 29 USCS § 158(b)(4)].

"(b) Whoever shall be injured in his business or property by reason or [of] any violation of subsection (a) . . . may sue therefor in any district court of the United States subject to the limitations and provisions of section [301 hereof 29 USCS § 185] without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

[2] The five prevailing plaintiffs were Cecil L. Kinty, d/b/a Kinty Trucking Company (hereinafter referred to as Kinty), Ruth M. Kittle, individually and as Administratrix with W. U. Annexed of the Estate of Bertsell Kittle, deceased (hereinafter referred to as Kittle), Thomas J. Gates, d/b/a Dorothy Coal Company and Gates Trucking Co. (hereinafter referred to as Gates), Lawrence Layman, d/b/a Layman Coal Company (hereinafter referred to as Layman) and Mrs. Josephine LaCare, widow of Original Plaintiff Orlanda LaCare, and Agnes LaCare Gobel, Patricia LaCare Cleavenger and Frances LaCare, the only children of Orlanda LaCare (hereinafter referred to as LaCare.)

verdicts. The defendant has, however, appealed in the five cases in which the jury found it liable and in which judgment was entered against it. It is that appeal which represents the issues for review here. Since the cases were tried together, we have heard the appeals together and decide them in this single opinion.

We affirm in part and reverse in part.

The evidence adduced at the trial of the combined cases was that in early 1958 several small, unorganized, independent mines located in Taylor and Barbour Counties, West Virginia, became the object of an intensive organizing campaign on the part of the defendant. The defendant contended such organizational campaign in the area was prompted initially by the request of the employees of the C & P Coal Company (often referred to in the record as the Railings), one of the original plaintiffs who did not prevail at trial, to represent them as a bargaining agent in their relationship with their employer. Whether the campaign by the defendant in the area began under these circumstances or not, the fact is that it quickly developed into an all-inclusive and all-pervasive effort to close down not simply the nine mine operators whose employees the defendant was seeking to organize and with whom alone the defendant had a labor dispute [3] but also any coal activity or movement in the entire area. It was seemingly directed at all mines, all tipples and all haulers throughout the area. There was no attempt made to distinguish between mines, with whom the defendant had a labor dispute, and those with whom it had none and intended none. It treated alike the hauling operations, without regard to whether the operators were independent haulers, operating under state certificates, whose employees the defendant did not even seek to and was actually unwilling to represent. It was not a half-hearted campaign but a campaign in which, to quote the language of the Trial Examiner in the La-

bor Board proceedings, "[t]he whole weight of the UMW organization was thrown." Its active direction was under one Myers, who was the field representative of District 31 of the UMW and chairman of its organizing committee. Four International representatives had been detailed to assist Myers in carrying on this campaign to force the targeted employers to sign union contracts and, in order to bring pressure on such employers to do so, to close down all coal activities in the area, according to plaintiffs' testimony.

As the first step in its campaign, the defendant approached the targeted mines and, as one of the mine operators testified, demanded the acceptance then and there of the standard UMW contract by the mine operators under the threat that if the latter did not accept and sign such contract, they would "never load another truck of coal." To give force to this threat, the representatives of the defendant added, according to the testimony of the operator first approached by the defendant's representatives, that "we have got a million dollars to break you guys and we will do it." This account does not, of course, accord with the testimony adduced by the defendant but it does find some support in the testimony of a member of the State police, who testified that Myers told him, during the picketing engaged in as a part of the campaign, that "he (meaning Myers) had a million and a half tons of non-union coal cut off and he was going to unionize them or keep it cut off."

When the mine operators who were the object of the organizational drive refused to sign the defendant's contract as submitted, active picketing began in April, 1958. It shortly took on a coercive character and it was extended rapidly throughout the whole area wherever there was any mining, transportation or shipping of coal. It was not confined to the entrances of the struck mines nor was it, as we have said, directed

3. These nine, as identified in the NLRB proceedings that arose out of these disputes, were Marra Brothers Coal Company, M & T Coal Company, Blue Ridge Coal Company, Sinsel Coal Company, Thompson Coal Company, Riley Coal Company, P & J Coal Company, C & P Coal Company, and Craigmoor Coal Company.

simply at the workers in the mines, where the defendant sought a labor contract. The pickets roamed the roads wherever any coal activity could be found. In order to cover the vicinity and to make effective a complete termination of all coal business therein, pickets were gathered at convenient vantage points, which constituted marshalling areas from which pickets would be dispatched quickly to those places where coal trucks might be traveling, etc. It was, in short, a well-organized program for closing down all coal activity in the area.

The picketing itself was not limited to persuasion. It assumed almost immediately an ugly character. There was massed picketing consisting of several hundred picketers. The pickets blocked roads throughout the area, threatened workers attempting to go into the mines or engaged in hauling coal, assaulted and beat workers not participating in the work stoppage found along the public roads, without regard to whether the workers were employed by a struck employer or by one not involved in a labor dispute with the defendant. Trucks attempting to haul coal in the area or cars carrying workers thought to be going to the struck mines were rocked and shot at. Workers engaged in any coal activity were threatened. Cars of workers were dynamited. Shovels at the mines and tipple machinery were blown up. In summary, a climate of terror and fear was created throughout the area. And that climate enveloped both the "struck mines" and those not involved in defendant's organizational campaign; it involved all truckers of coal, including truckers who were independent employers.

There was ample testimony that such picketing was conducted under the defendant's supervision. This testimony was direct and positive. According to the testimony of a State police officer, Myers told him at one time during the height of the strike that "they [the pickets] were his men and he was responsible for them." Moreover the pickets were all being paid $30 per week by the defendant.[4] There was accordingly clearly sufficient evidence in the record for the jury to conclude that the defendant had responsibility for the pickets and their conduct.

The defendant offered testimony, it is true, that neither it nor its representatives on the spot knew of any improper conduct on the part of the pickets. It went further and claimed that it gave specific instructions that no force at all was to be used by the pickets. Both Myers and the International representatives, however, were very evident during the picketing. They were seen often with the pickets. There was actually testimony, though denied by Myers, that Myers was responsible for at least some of the dynamiting and gunfire that occurred during the picketing. Some witnesses put Myers either at or near the scene when pickets assaulted and beat workers. He was also identified as present when road blocks were established. In any event, the defendant's responsibility was, under the evidence, a question for the jury and the jury resolved the issue against the defendant.[5] Both we and the defendant are bound by that resolution of the issue by the jury.

Despite the vigor and force with which the defendant pressed its campaign, some mining continued in the area for a number of months after the defendant began its picketing. State troopers were called into the area and controlled at times the picketing. At some point, though, any real coal activity ground largely to a halt in the area.

4. The defendant offered testimony that it was no condition to such payment that the payee picket but it seems undisputed that all pickets did receive the payment of $30 per week. Certainly, the defendant was not paying all unemployed union members $30 per week.

5. It is of interest, though not relevant to these cases, that charges somewhat similar to those involved here against District 31 have been before this Court. See National Labor Relations Bd. v. United Mine Workers (4th Cir. 1951) 190 F.2d 251, and National Labor Relations Bd. v. United Mine Workers (4th Cir. 1952) 198 F.2d 389, cert. denied 344 U.S. 884, 73 S.Ct. 183, 97 L.Ed. 684 (1952).

Some of the mine operators, however, had in the meantime filed charges (under § 10(b) of the National Labor Relations Act against the defendant with the National Labor Relations Board.) The Board issued a complaint on these charges sometime in either the latter part of 1958 or first part of 1959, and a full hearing on such charges was held during February and March, 1959. The Trial Examiner thereafter filed in July, 1959, his Report, which was substantially adopted by the Board as a basis for its order that the defendant should "cease and desist from: (a) Restraining and coercing the Employees, or any of them, [of the charging parties] * * * or any other employees engaged in mining operations within the geographical limits of the jurisdiction of District 31, United Mine Workers of America, in the exercise of the rights guaranteed them by Section 7 of the Act, by exerting force, or committing acts of force and violence against said employees, or any of them, or by using or threatening to use force or violence, or by taking or threatening to take punitive action or economic reprisals against any of said employees, unless said employees join in the concerted activities or become members of said District 31 or its affiliated locals."[6] With

the issuance of the Intermediate Report of the Trial Examiner and a temporary order to desist, the activities of the defendant and its representatives in the area ceased sometime in June or July, 1959, though the Board's ultimate order was not issued until 1960 and the judicial order of enforcement in somewhat narrowed form of the Board's order was not issued until early 1962.[7] On June 28, 1961, these actions and the cases of seven other plaintiffs, two of which were later dismissed, were begun in the Eastern District of Kentucky but, on motion of the defendant, were transferred to the Northern District of West Virginia. Many unfortunate delays, including the deaths of two of the judges to whom the cases were assigned for trial, the death of plaintiffs' counsel with the delay incident to substituting counsel, as well as two appeals heard in this Court[8] and one in the Supreme Court,[9] prevented a trial of these cases until September, 1974, some thirteen years after they had been begun. At such trial, the appellees, as we have said, recovered verdicts, upon which were entered the judgments involved in these appeals.

Before turning to the defendant's challenge to the judgments, it is necessary to recognize that the plaintiffs at trial fell into

6. 129 N.L.R.B. 146 (1960).

7. *International Union, United Mine Workers v. N.L.R.B.* (1962), 112 U.S.App.D.C. 60, 299 F.2d 441.

 The findings of the Board as ordered enforced by the Court, have been held in some cases to be conclusive on the issue of secondary boycott, assuming the Union appeared and was represented at the hearing before the Board. *Texaco, Inc. v. Operative Plasterers and Cement Masons International Union* (5th Cir. 1973) 472 F.2d 594, *cert. denied* 414 U.S. 1091, 94 S.Ct. 721, 38 L.Ed.2d 548 (1973); *H. L. Robertson & Assoc., Inc. v. Plumbers Loc. Un. No. 519, Etc.* (5th Cir. 1970) 429 F.2d 520, 521; *Painters Dist. Coun. No. 38, Etc. v. Edgewood Contracting Co.* (5th Cir. 1969) 416 F.2d 1081, 1084–5; *cf., Paramount Transport Sys. v. Chauffeurs, Etc., Local 150* (9th Cir. 1971) 436 F.2d 1064, 1065; *Tungsten Mining Corporation v. District 50, Etc.* (4th Cir. 1957) 242 F.2d 84, 97–9, *cert. denied* 355 U.S. 821, 78 S.Ct. 27, 2 L.Ed.2d 36 (1957); *contra, Old Dutch Farms, Inc. v. Milk Drivers & Dairy Emp. Union* (2d Cir. 1966) 359 F.2d 598, 602–3, note 7, *cert. denied* 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67

(1966); *Riverton Coal Co. v. United Mine Workers of America* (6th Cir. 1972) 453 F.2d 1035, 1042, *cert. denied* 407 U.S. 915, 92 S.Ct. 2439, 32 L.Ed.2d 690 (1972); *Clark Eng. & Const. Co. v. United Bro. of Carpenters* (6th Cir. 1975) 510 F.2d 1075, 1083–4; *Shell Chem. Co., Div. of Shell Oil Co. v. Teamsters L. U. No. 676* (D.N.J.1973) 353 F.Supp. 480, 482–4; *Strip Clean Floor Refinish. v. New York Dist. Coun. No. 9* (E.D.N.Y.1971) 333 F.Supp. 385, 388–92.

 *See, also,* Note, *Applicability of Res Judicata and Collateral Estoppel to Actions Brought Under § 8(b)(4) of the National Labor Relations Act,* 67 *Mich.L.Rev.* 824 (1969).

 No party, however, raised this point and we have not considered its possible relevancy, if any, in these cases.

8. *Railing v. United Mine Workers of America* (4th Cir. 1970) 429 F.2d 780, *vacated and remanded* 401 U.S. 486, 91 S.Ct. 991, 28 L.Ed.2d 272, and *ibid.* (4th Cir. 1971) 445 F.2d 353.

9. *United Mine Workers of America v. Railing* (1971) 401 U.S. 486, 91 S.Ct. 991, 28 L.Ed.2d 272.

two broadly identifiable groups. The first group consisted of mine operators, whose employees the defendant claimed it was seeking to represent. The second group were haulers, owning their own trucks, employing their own drivers, and engaged in transporting coal primarily from the mines of others to the various tipples in the vicinity, or small mine owners, apparently regarded as too small for organization by the defendant. The employees of this latter group of plaintiffs, the defendant concedes, were not the object of the defendant's organizing campaign. And the jury verdicts indicate the jury made a clear distinction in rights between the two groups, treating apparently the first group as primary employers and the second as secondary or neutral employers.[10]

The defendant begins its attack upon all the judgments by advancing the thesis that its picketing in these cases was "traditional" primary picketing and as such was without the ban of § 187. The theory on which it bases this argument is its premise that picketing of a "neutral" employer and his employees is primary if the work of such employees is "necessary to the normal operations" of the primary employer, and this is true, irrespective of where the picketing occurs. It contends that *Steelworkers v. Labor Board* (1964) 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 and *Electrical Workers v. Labor Board* (1961) 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592, are authority for such position. Accordingly, it argues that, even though it be assumed that

the prevailing plaintiffs were all neutral employers, their operations were "necessary to the normal operations" of the primary employers and any picketing of their operations *anywhere* was primary. Were it not clear that the argument of the defendant on this point is without merit, it might be of interest to inquire just how certain of the prevailing plaintiffs who had no connection of any kind with the primary employers could fall within the category of employers whose employees were performing work necessary to the day-to-day operations of the primary employers. But it is unnecessary to pursue this inquiry, since on its merits, this argument of the defendant is untenable.

There is, of course, no dispute with the defendant's theorem that the ban of the statute does not extend to "traditional primary strikes and picketing." Prior to 1959, such an exemption from the statute's proscription was not written into the statute itself but the Courts had read it in and in 1959 the Congress included the exemption within the specific language of the Act.[11] But the statute did not, either as originally enacted or as amended, define primary picketing, leaving that difficult task to the Courts.[12] Picketing, in the early decisions, was defined as primary if conducted at or near the entrance to the struck plant or facility. But difficulty arose in applying this simple test to the "common situs" situation where there were employees of both the employer against whom the strike was directed and employees of neutral or independent employers at the situs of the labor

---

10. *C. Comella, Inc. v. United Farm Workers Org. Com.* (1972) 33 Ohio App.2d 61, 292 N.E.2d 647, 656, sets forth concise definitions of "primary employer" and "secondary employer." The primary employer is "[t]he employer with whom the union has a labor dispute;" a "secondary employer" is "[a] neutral person or business who has no labor dispute with a union."

11. *See Steelworkers v. Labor Board, supra*, 376 U.S. at 498, n. 5, 84 S.Ct. 899; Note, *Secondary Boycotts: The New Scope and Application of the "Cease Doing Business" Requirement of Section 8(b)(4)(B)*, 71 *Colum.L.Rev.* 1077, 1078 (1971).

12. *See Railroad Trainmen v. Terminal Co.* (1969) 394 U.S. 369, 386–7, 89 S.Ct. 1109, 1120, 22 L.Ed.2d 344, *reh. denied* 394 U.S. 1024, 89 S.Ct. 1622, 23 L.Ed.2d 51 (1969):

 "No cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries. These tasks were first undertaken by judges, intermixing metaphysics with their notions of social and economic policy. And the common law of labor relations has created no concept more elusive than that of 'secondary' conduct; it has drawn no lines more arbitrary, tenuous, and shifting than those separating 'primary' from 'secondary' activities."

714

dispute.[13] This was substantially the situation faced both in *Electrical Workers* and *Steelworkers*. Neither case had any reference to picketing away from or not "proximate" to the primary premises nor was the union in either case seeking to extend the issue beyond that involving picketing at the struck facility or plaintiff itself.

In the *Steelworkers Case* the point in issue as stated by the appealing union itself was simply "that no picketing at the primary premises should be considered as secondary activity."[14] That was the issue presented by the union on its appeal and that was the issue to which the Court addressed itself in its decision in that case, *i. e.*, when "picketing at the primary premises should be considered as secondary activity." The Court was not called on to consider and did not purport to establish any rule for picketing of a neutral employer away from or not "proximate" to the "primary premises" themselves. The Court quoted with approval from the dissenting opinion in the Court below that the picketing at the gate in question "accomplish[ed] no more than picketing outside one of Carrier's own delivery entrances might have accomplished;" it emphasized that the gate in question was to a fence, which, though located at that particular point on the railroad right of way, was but "a continuation of the fence surrounding the Carrier plant" and which was the only "place where the union could have brought home to the railroad workers servicing Carrier its dispute with Carrier."[14a] Because of these peculiar circumstances, it was held that "picketing at a situs so proximate and related to the employer's day-to-day operations is no more illegal than if it had occurred at a gate owned by Carrier."[15] In essence, the Court predicated its decision on *the combined circumstances* of proximity of the picketing to the struck facility and the relatedness of the service being burdened to the plant's "day-to-day operations." Both circumstances were essential elements in the finding of legality in that case. It was not job relatedness alone which made the picketing legal in that case; it was job relatedness *plus* situs of picketing "proximate to" the labor dispute that imparted legality to the picketing.[16]

The record in *Electrical Workers* is equally clear that the Court was only dealing with picketing at the struck plant itself. The Court in that case stated that "the question (for determination) is whether the Board may apply the *Dry Dock* criteria so as to make unlawful picketing at a gate utilized exclusively by employees of independent contractors who work on the struck employer's premises."[17] As the phrasing of the "question" makes manifest, the Court there was only concerned with picketing about the plant or facility of the "struck" employer; it was not attempting to answer any "question" about picketing apart from that of primary location.

Both cases relied on by the defendant for its initial contention thus concerned picketing at a gate leading into the struck facility, which was used by employees of a neu-

13. The general rule applicable to the "common situs" situation in the highly elusive primary-secondary problem, as phrased in what is spoken of generally as the *Dry Dock Doctrine*, 92 N.L.R.B. 547, is stated in *Ramey Const. Co., Inc. v. Local U. No. 544, Painters, etc.* (5th Cir. 1973) 472 F.2d 1127, at 1130–2. Among the requirements of the test is whether the picketing is at "the situs of the dispute" or "reasonably close to the situs." Thus, the place of picketing is always a vital or important issue in the resolution of a secondary boycott problem. *See, also*, Lesnick, *The Gravamen of the Secondary Boycott*, 62 *Colum.L.Rev.* 1363, 1418 (1962).

*Cf., also*, Note, *Secondary Boycotts*, 44 *N.Y. U.L.Rev.* 1195, 1197 (1967):

"The situs of the dispute has long been considered a relevant, and often determinative, factor in applying the balancing test. What is primary activity at one situs may be secondary at another."

14. 376 U.S. at 497, 84 S.Ct. at 903.

14a. 376 U.S. at 500, 84 S.Ct. at 904.

15. 376 U.S. at 500, 84 S.Ct. at 904.

16. Actually, this emphasis on "proximateness" in location in the opinion is a restatement of one of the conditions in the approved *Moore Dry Dock* rule that the picketing be "reasonably close" to the situs of the primary dispute.

17. 366 U.S. at 680, 81 S.Ct. at 1293.

tral employer in gaining access to the struck plant.[18] The only difference in the two cases was that, in *Electrical Workers,* the gate into the struck plant was on the property of the primary employer and in the second it was on "premises belonging to the neutral employer," but "adjacent" and "proximate" to the struck plant. But in each instance the picketing was at a gate leading into the struck facility. What the Court was seeking to do in both cases was to establish a rule for determining when picketing of employees entering the struck facility by a gate leading into the facility, reserved for the exclusive use of third-party employees of third-parties, becomes primary picketing. It was only in that context that the Court used the type of work being performed by the employees of the third-parties entering the struck facility as the criterion for determining whether the picketing was primary or secondary.[19] It follows that these cases can in no way be deemed authority for defendant's position.

This argument of the defendant, if sustained, would mean that the location of the picketing would be of no significance in determining whether the picketing was allowable primary picketing or forbidden secondary picketing. So long as the neutral employer rendered services relating to the primary employer's "day-to-day operations," picketing of his employees anywhere, would under this theory, be primary picketing. Thus, the utility which provided power for the struck plant could be picketed at its power plant miles away from the situs of the labor dispute and its employees be induced thereby to discontinue work without implicating the statute.[19a] This

contention, which would, as we have said, make practically all picketing primary, would render the statute powerless to protect against conduct Congress clearly intended to prohibit. Independent haulers of coal from a coal mine, in particular might be subjected under this reasoning to picketing, not at the entrance to the mines where there could be "proximate[ness] and related[ness] to the [struck] employer's day to day operations," but along public roads not at all "proximate" to the struck mines. Neither *Electrical Workers* nor *Steelworkers* supports this argument, and *Riverside Coal Co. v. United Mine Workers of America* (6th Cir. 1969) 410 F.2d 267, 272–3, *cert. denied,* 396 U.S. 846, 90 S.Ct. 89, 24 L.Ed.2d 95 (1969); *Ritchie v. United Mine Workers of America* (6th Cir. 1969) 410 F.2d 827, 835; *Sunfire Coal Company v. United Mine Workers of America* (6th Cir. 1963) 313 F.2d 108, 110, *cert. denied* 375 U.S. 924, 84 S.Ct. 268, 11 L.Ed.2d 166 (1963); *Flame Coal Company v. United Mine Workers of America* (6th Cir. 1962) 303 F.2d 39, 42–3, *cert. denied* 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962); *Gilchrist v. United Mine Workers of America* (6th Cir. 1961) 290 F.2d 36, 39, *cert. denied* 368 U.S. 875, 82 S.Ct. 120, 7 L.Ed.2d 76 (1961); *United Mine Workers of America v. Osborne Mining Co.* (6th Cir. 1960) 279 F.2d 716, 723–4, *cert. denied* 364 U.S. 881, 81 S.Ct. 169, 5 L.Ed.2d 103 (1960), all are authority that such picketing is not primary, but secondary. The defendant, it is true, seeks to weaken the authority of these mining cases by observing that *Osborne* and *Gilchrist* were decided before *Electrical Workers* and *Steelworkers,* but it neglects to observe that *Ritchie* and *River-*

---

**18.** *See Harrah's Club v. N.L.R.B.* (9th Cir. 1971) 446 F.2d 471, 479, *cert. denied* 404 U.S. 912, 92 S.Ct. 231, 30 L.Ed.2d 185 (1971):

"In each of those cases [referring to *Electrical Workers* and *Steelworkers* ] the problem concerned picketing at the premises of the employer with whom the primary labor dispute existed."

**19.** *See* 376 U.S. at 497, 84 S.Ct. at 903:

" * * * The legality of separate gate picketing depended upon the type of work being done by the employees who used that gate; * * * ."

**19a.** This illustration may seem somewhat extreme but Justice Blackmun, while still a Circuit Judge, used a similar illustration in *National Maritime Union of America v. N.L.R.B.* (8th Cir. 1966) 367 F.2d 171 at 177, *cert. denied* 386 U.S. 959, 87 S.Ct. 1030, 18 L.Ed.2d 108 (1967) to emphasize that "[t]he distinction" between when the delivery of services essential to "day-to-day operations" of a struck plant is primary picketing "lies in the situs" of the picketing, or, as he later puts it in this case, the "proximateness of primary status, [sic]" 367 F.2d at 178.

*side* were decided after *Electrical Workers* and *Steelworkers.*[20]

 The defendant, however, as its second contention, attacks the judgments in favor of Kinty, Kittle and Gates on the grounds that they were all "allies" of primary employers and that any picketing directed at them represented, under those circumstances, primary picketing. By advancing such argument, the defendant asserts by way of defense the "ally" doctrine, as it has evolved in the enforcement of § 187. This is a doctrine without "statutory basis" but one which has been developed by the courts, drawing upon "the historical treatment of secondary union activity and the [statute's] legislative history."[21] Under this doctrine, if concerted union activity "is directed against an employer who is 'firmly allied' in economic interest with the primary employer, it will be treated as primary action not subject to the ban of section 8(b)(4)(B)."[22] The situations in which the doctrine is to be applied have been classified by one commentator under three "concepts": The first, "based on the secondary's performance of struck work, will be designated the 'farmed-out struck work' concept; the last two, based on significant breakdowns in the normal barriers between business entities dealing at arm's length, will be labeled the 'single enterprise' and the 'coemployer' concepts."[23] The annotator in 13 A.L.R.Fed. 466 at 473, reduces the classifications to two "concepts," as stated by him:

"The ally doctrine in secondary boycott cases may be viewed as being two doctrines, or at least one doctrine which deals with two different situations. First, it may be applied when a secondary employer does struck work for the primary employer, and second, it may be applied when a primary employer and a secondary employer are so closely related or integrated that the secondary employer should not be permitted the protection of § 8(b)(4)(B). Whichever type of ally situation is present, the result is the same. The doctrine serves as a defense for a labor organization or agent charged with violating § 8(b)(4)(B), and denies that section's protection to the secondary employer."

There is no dispute that the cases under review do not involve " 'the farmed-out struck work' concept." The defendant does contend, however, that the doctrine is applicable to the actions filed by Kinty, Kittle and Gates because of the intimate relationship existing between them and the primary employers. In raising such a claim, the defendant is setting up "an affirmative defense which the [defendant] had the burden of proving in [these cases]." *N.L.R.B. v. General Teamster, Ware. & Dairy Emp., Loc. No. 126* (7th Cir. 1970) 435 F.2d 288, 291.

---

**20.** This is not to say that the factors argued by the defendant under this point are totally irrelevant. But their relevancy attaches to the second argument advanced by the defendant, to which we next turn. *See*, Annotation 13 A.L.R.Fed. 466 at 471–2, n. 8:

"This doctrine states that reserved-gate picketing *at the primary employer's premises* is unlawful primary activity where (1) the gate is a separate gate, marked and set apart from other gates; (2) the work done by the men using it is unrelated to the employer's normal operations; and (3) the work done by the men who use the gate is of a kind that would not, if done when the employer was engaged in his regular operations, necessitate curtailing those operations. See generally, 48 Am.Jur.2d, Labor and Labor Relations § 844. The reasoning applied in the second and third parts of the reserved-gate doctrine would have important effects on the ally doctrine." (Emphasis added)

**21.** Levin, *"Wholly Unconcerned": The Scope and Meaning of the Ally Doctrine Under Section 8(b)(4) of the NLRB*, 119 *U. of Pa.L.Rev.* 283, 285 (1970).

**22.** *Ibid.* at 285.

The doctrine originated in *Douds v. Metropolitan Federation of Architects, Etc.* (S.D.N.Y. 1948) 75 F.Supp. 672, which, though generally identified with the "farmed-out" concept, actually laid out the second basis for the use of the doctrine. The first Circuit Court decision, applying the doctrine was *National Lab. Rel. Bd. v. Business Mach. & Office A., Etc.* (2d Cir. 1955) 228 F.2d 553, *cert. denied* 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956).

**23.** *Ibid.* at 288.

In determining whether there is such interdependent relationship as to authorize the application of the "ally" doctrine, the courts look to the whole range of the connections between the primary and independent employer. One of the factors considered is the extent of managerial control, particularly in the field of labor relations,[24] exercised by the primary employer over the independent employer and his employees. *Truck Drivers & H. Local U. No. 728 v. Empire State Express* (5th Cir. 1961) 293 F.2d 414, 420, *cert. denied* 368 U.S. 931, 82 S.Ct. 365, 7 L.Ed.2d 194 (1961); *Building Service Emp. Internat'l U., Local 32–J v. N.L.R.B.* (1963), 114 U.S.App.D.C. 199, 313 F.2d 880, 883; *J. G. Roy & Sons Co. v. National Labor Relations Bd.* (1st Cir. 1958) 251 F.2d 771, 773–4.[25] Economic depend-

ence of the independent employer on the primary employer, while relevant, is not sufficient in and of itself to warrant an "ally" conclusion as a matter of law. *Carpet, Linoleum, Soft Tile, Etc., Loc. U. No. 419 v. N.L.R.B.* (1972), 151 U.S.App.D.C. 338, 467 F.2d 392, 400–1.[26] Similarly, "[e]xclusive or substantial dealing" between the secondary and primary employer does not necessarily require a finding of a single enterprise. Levin, *Ibid.,* at 321; *Teamsters Local 996,* 111 N.L.R.B. 1220 (1955). On the other hand, the mere fact that an employer may meet the indicia of independent contractor does not automatically catalogue him as a secondary employer, free of any claim of "ally" of a primary employer. *Local No. 24, Inter. Bro. of Teamsters, Etc. v. N.L.R.B.* (1959), 105 U.S.App.D.C. 271, 266 F.2d 675, 680.[27] In essence, no single or

**24.** In 13 A.L.R.Fed. at 542, the editor states:
"The presence or absence of a common labor policy, although not necessarily determinative, is one of the more important factors considered by the courts or the Board in determining whether commonly owned enterprises should be considered to be allies in a labor dispute."

In *Truck Drivers Local 728, supra,* 293 F.2d at 420, the Court said:
"* * * The pertinent question here is whether [the secondary] was [the primary's] agent with regard to [the primary's] labor relations with the [disputing employees]."

In *Building Service Employees, supra,* 313 F.2d at 883, the Court said:
"* * * We think it clear, however, that [the alleged secondary employer's] relationship to Terminal was in the 'zone of dispute in which such formulae are useless' and * * * required * * * the history of [his] relationship to Terminal; the conduct of his cleaning business and its relation to Terminal's business; and Terminal's influence on, if not control over, [his] labor policy."

In *General Teamster, Ware. & Dairy Emp., supra,* 435 F.2d at 291, the Court said:
"* * * Most importantly, there is absolutely no evidence of any common labor relations policy among the companies at the time of this dispute."

**25.** The NLRB is said to hold that "control" is the decisive factor in this connection: If there is not "control", the "ally" doctrine is generally found not applicable. For a critical discussion of this principle, *see,* Note, *Local 638, Enterprise Association of Plumbers v. NLRB,* 62 Va. L.Rev. 634 (1976); Leslie, *Right to Control: A Study in Secondary Boycotts and Labor Antitrust,* 89 Harv.L.Rev. 904 (1976). The rule in

this Circuit is that control is an important consideration in this context but not decisive. *George Koch Sons, Inc. v. N.L.R.B.* (4th Cir. 1973) 490 F.2d 323, at 326. *See, also, Associated Gen. Contractors of Cal., Inc. v. N.L.R.B.,* 514 F.2d at 437.

**26.** In this case, the Court said:
"* * * It further indicates that the mere fact that the relationship between two parties involves some economic interdependence is not sufficient in and of itself to cause one of the parties to lose its 'secondary' status, for section 8(b)(4)(B) purposes, *vis-a-vis* the other party. This conclusion is dictated by the very nature of secondary boycotts. It is intuitively obvious that a union which is engaged in a labor dispute with one party will not endeavor to enlist the support of another party, *unless* there is some relationship present, direct or indirect, between the two parties. This most frequently involves an economic relationship. Without the presence of *some* interrelationship between the two parties, it would be an exercise in futility for the union to seek the aid of the second party, since it would necessarily have no possible means of providing meaningful support for the union. It is therefore logically apparent that something more than mere economic interdependence between two parties is required before one loses its 'secondary' status with respect to the labor disputes of the other." [Emphasis in opinion]

**27.** In this case, the Court said the determination of the relationship of "ally" falls into that "zone of dispute in which such formulae [as is provided by 'legalistic formulae' (such as) 'independent contractor,' 'coemployer' or 'allies']

isolated circumstance is sufficient to justify the application of the doctrine; to the contrary, its application is to be determined on a "case-by-case basis" in the light of "all the surrounding circumstances" and after a cautious weighing of all the facts. *George Koch Sons, Inc. v. NLRB, supra,* 490 F.2d at 327. In emphasizing this Professor Levin has put it that "the standards for measuring when sufficient 'relatedness' exists to justify holding two entities to be one are tenuous in the absence of a definite action such as farming out work. In addition to common ownership, common control, and integration of operations, the Board and the courts have looked to whether the two companies do substantial business with each other, occupy the same premises, share or exchange employees or interchange functions, advance each other credit or do business on less than competitive terms, or maintain separate records, payrolls, tax returns, and public images. The result is a naked exercise of judicial discretion—and unspoken balancing of the right to strike against the strike's projected social advisability. The test for singleness requires a sufficient accumulation of the considerations enumerated above. Because any number of these considerations may arise in a particular case with each consideration given a different weight, the constraining pressure of stare decisis to articulate a decision's rationale in accord with precedent is largely absent. The decisionmaker's personal concept of what is best for society often determines which sum of the relationships is sufficient to justify holding two companies one, under cover of a general rule." Levin, *Ibid.,* pp. 320–1. To the same

general effect is the comment of the editor in 13 A.L.R.Fed. at 477, quoting from Egan, *The Ally or Co-employer Doctrine,* 24 *Loyola L.Rev.* 109, p. 120 (1967):

> "* * * '[s]ince two enterprises can be tied together in a endless variety of relationships, it seems pointless to attempt to set up rules which would separate all the possible situations into two neatly defined categories called 'neutral' and 'primary.' Indeed, in this area, the courts and the NLRB often content themselves with listing as many facts as possible and then making a general pronouncement as to who is neutral and who is not.' " [28]

Accordingly, it follows that in a legal action under § 187, it is ordinarily a fact issue for resolution by the jury whether the independent employer is to be considered an "ally" of the primary employer. Only if the facts are so compelling one way or the other that it can be said that as a matter of law the independent employer is or is not a secondary employer does the issue become one of law.

If we apply these various factors to the relationship of the plaintiffs Kinty, Kittle and Gates to the primary employers in these cases, it is manifest that it cannot be held that as a matter of law they were "allies" of the primary employers. In fact, there seems no reason to assume that Gates was, under any evaluation of the evidence, an "ally." He operated his own mine and did his own hauling. The defendant was not seeking to organize and made no claim to represent his employees. There was no labor dispute between him and the defendant and the defendant does not contend

---

are useless, and the answer must be derived by applying the intent of the statute to the facts in the case." 266 F.2d at 680.

**28.** In *Vulcan Materials Co. v. United Steelworkers of America* (5th Cir. 1970) 430 F.2d 446, 451, *cert. denied* 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971), the Court put this same rule in these words:

> "It has been held that in order for an employer who is subject to a secondary boycott to avail himself of the protection afforded by the statute, it must be neutral and not affiliated or allied with the primary employer and that the neutrality of the secondary employer

is destroyed and it is deemed to be an ally of the primary employer for the purposes of Section 8(b)(4) where there is actual common control exemplified by domination of the secondary employer by the primary employer, where there is an overlapping of management function, or where the economic fortunes of the two companies are inextricably interwoven, as, for example, where the secondary employer does substantially all his business with the primary employer or where there is a substantial integration of the two employers of the operational level."

there was one. Yet the defendant, under the plaintiffs' testimony, sought by force and violence to induce Gates' employees to quit work as part of its overall strategy to put pressure on the primary employers to sign a contract with it. The only fact cited by the defendant in support of its theory that Gates was not a neutral employer was that occasionally he hauled coal for two of the primary employers. The mere fact that a part of his hauling operations was for primary employers is insufficient in our opinion to provide a basis for submitting the validity of his secondary status to the jury.[29] And at trial the defendant seems to have had this same view of the testimony. It asserted this "ally" doctrine as a defense only against the claims of Kinty and Kittle and it appears that Gates became involved in such defense merely upon appeal. This, it seems, was made clear by the defendant in its objections to the instructions on "secondary" employers at trial. At that time it phrased its objection to the Court's instruction on secondary and primary employers only to the declaration "that the Kinty and the Kittle truckers were secondary [or neutral] employers." It made no such objection to the Court's reference to Gates. It would appear from this that the defendant assumed that Gates was "neutral." In any event, we are of the opinion that, under the evidence, Gates was an independent employer, whose "secondary status" was clear and beyond dispute.

The status of the plaintiffs Kinty and Kittle, however, is not as clear-cut. Neither Kinty nor Kittle owned an interest in any mine; they were solely coal haulers, operating independently. They were quite similar to the haulers in *Gilchrist, Osborne* and *Ritchie, supra,* as well as in *Haughton v. Columbia River District Council No. 5, Etc.* (9th Cir. 1961) 294 F.2d 766, 767, all of whom were found to be secondary employers. They owned their own trucks; they

employed their own employees; they fixed the wages of their employees and paid them from their own funds; they exercised complete control over the work of their employees. The one fact on which the defendant rests its claim of "ally" status in the case of Kittle, and to some extent, of Kinty, is the possible "economic interdependence" between them and the primary employer, C & P Coal Company. At the time the strike began, both Kinty and Kittle were hauling solely for C & P Coal Company. However, they did this under no contract. Kinty and Kittle had both long been in the coal hauling business. Kittle had been so engaged since 1945, some thirteen years before the campaign of the defendant began in the area, Kinty since 1950, eight years before the campaign commenced. They had in the past hauled for other coal producers and their day-to-day relationship with C & P in April, 1958, did not preclude them from hauling for others afterwards or even then. The defendant apparently in answer to this suggestion, though, argues that when C & P was closed by the strike, there were no other mines operating and no coal to be hauled and no other hauling available for these plaintiffs. Whether this circumstance, if correct, would have any relevance to this issue is doubtful, but nonetheless, as the District Court correctly stated to counsel for the defendant when he sought at trial to advance this argument, mining continued in the area for some time after the strike began at the C & P mine. And, we might add parenthetically that, if it were true that, with the beginning of the strike at the C & P mine, all mining ceased in the area and there was no coal to be hauled, why did the defendant organize ambulatory pickets to threaten and assault the haulers of coal in this area? In any circumstance, we do not consider the single fact that at the time the strike began at the C & P mine, both Kinty and Kittle were hauling only for C & P decisive, as a matter of law,

**29.** There is a certain inconsistency between this argument of the defendant on the merits of Gates' claim and its argument on Gates' damage claim. This argument would destroy Gates' claim because he did some hauling for primary employers. On the other hand, on the liability issue, defendant contends Gates' hauling business is outside the scope of the controversy.

that they are not "secondary" employers.[30] It is, however, a fact that does make the status of the two a question for the jury. There is, so far as Kinty is concerned, also, two other circumstances cited by the defendant as bearing on his neutral status. There was proof that sometimes on his own time, without any suggestion from the C & P and without any compensation therefor, he would clean up the coal above the mine, which he intended to haul the next day. It was only done after work at the mine had ceased. Kinty explained this as a means of expediting his hauling the next day. Also, after the strike began, Kinty, apparently at the instance of C & P, attempted to induce the workers at the C & P mine to return to work. While both these circumstances were relevant to Kinty's status, we are of the opinion that they were matters for the consideration of the jury and did not justify a finding that as a matter of law Kinty had not lost his secondary status. And this seems to have been the opinion of the defendant at trial. Thus, at the conclusion of plaintiffs' testimony, counsel for the defendant, in a colloquy with the trial judge on the status of the parties, said that "it [i.e., the independent status of Kinty and Kittle] is a jury question." [31]

■ The difficulty with the verdicts in favor of the plaintiffs Kinty and Kittle lies in the failure of the District Court to leave to the jury whether such plaintiffs were "secondary employers." It is true that the initial charge of the trial court can be read as properly submitting this issue to the jury

for determination. However, the jury, after deliberating for some hours, requested of the trial court further explication on the definition of "secondary employer," among other things. In responding to such request, the Court told the jury:

" * * * Now, the secondary employer in his case would be any one of these plaintiffs that he did business with, and doing business is buying coal from them and, though it is only occasionally, haulers, he had haulers, not his own employees; for example, Kittle or Kettle or whoever these fellows were that had several independent trucks, I mean trucks of their own, who were hauling coal by the ton, not employees of the Railings at all, but they were processors, haulers of coal, they were secondary employers, they had people working for them driving their trucks. * * *."

The defendant asserts that this was an instruction that Kinty and Kittle were secondary employers, thus taking this issue away from the jury. That this is the proper construction of the trial court's instruction finds confirmation in the court's own construction of its language, as stated in answer to the objection of the defendant to such instruction.[32] We conclude with some reluctance that the actions of the plaintiffs Kinty and Kittle must be remanded for error in instructions.[32a]

■ The defendant's challenge to the judgment in favor of Gates and Layman raises the point that in neither case were their employees "even encourag[ed] or in-

---

**30.** See, N.L.R.B. v. Dallas General Drivers, Etc., Local No. 745 (5th Cir. 1959), 264 F.2d 642, 647, cert. denied 361 U.S. 814, 80 S.Ct. 54, 4 L.Ed.2d 61 (1959).

**31.** See, Appendix pp. 443–4 and 456.

**32.** After the Court concluded its explanation to the jury, the defendant entered its objection in the following colloquy with the Court:
"Mr. Combs: Just one, I call it the idea that the Court was saying, that the Kinty and the Kittle truckers were secondary employers— The Court: I don't think there's any question about it. I did say that. Is that wrong? Mr. Combs: I think so in this context: That that is a question of fact for the jury on

whether or not they are, because we raised the question.
The Court: There is no evidence that they are not. You raised the question as to one. There is just no evidence. I did tell them that and I will tell them there is no evidence to the contrary they had any connection with it.
Mr. Combs: I am not asking you to repeat it. I am objecting to it, for the record.
The Court: All right, I understand that."

**32a.** Simpson v. Lambert Brothers Div.-Vulcan Materials Co. (4th Cir. 1966) 362 F.2d 731, 733–4.

duc[ed] to do anything." [33] There is some evidence, however, that at least two of Gates' employees were stopped by the pickets, told to dump their load of coal and not to "come back." As a result, these employees brought their trucks back and quit work. The plain inference is that they quit work because of the action of the pickets which they treated as a threat. But this is not all the evidence supporting plaintiffs Gates' and Layman's contention that their employees were induced by the wrongful conduct of the defendant's pickets. It will be remembered that the picketing was not confined to the employees of primary employers or even to a single neutral employer and his employees. As in *Osborne Mining, supra*,[34] it was designed and intended to affect the employees of all the neutral employees in this coal producing area. The activities of the defendant and its pickets were extensive and well advertised. They created tremendous commotion in the area. It is inconceivable that these activities, consisting of threats, assaults, mass picketing, overturned cars, dynamiting and shooting, were not known by all the employees of the neutral employers in the vicinity. And it is fair to say that to a considerable extent this was the purpose behind the activity.[35] It is easily understood why the employees of these plaintiffs, who, before the defendant began its activities were working, were unwilling to hazard reporting for work in the face of the situation which was created throughout the region and the situation which the NLRB finally concluded it had to restrain because of the coercive conduct throughout District 31. *See, Flame Coal Company v. United Mine Workers of America, supra*, 303 F.2d at 43;[36] *White Oak*

**33.** It must be noted that these cases arose before the Amendments of 1959 and this objection rests on the language of the statute as it existed prior to these Amendments.

**34.** 279 F.2d at 723–4.

**35.** *Cf., National Labor Relations Board v. Local 140, Etc.* (2d Cir. 1956) 233 F.2d 539, 540–1.

**36.** In this case, speaking to a claim similar to that asserted by the defendant here, and in upholding a finding of inducement of employees of a neutral employer by the same union as involved here, the Court said:

" * * * Such evidence disclosed the broad pattern of defendant's campaign, with violence sufficiently spectacular and in such proximity to plaintiffs' operation as to become known to secondary employers and their employees and to induce them to discontinue mining or hauling coal for Flame."

Again, in *White Oak Coal Company, supra*, the Court said 318 F.2d at 597–8:

"Appellant Union contends there was no evidence that it had violated Section 303 of the National Labor Relations Act, 1947, 29 U.S.C.A. § 187, in inducing a secondary boycott of appellee company. It appears that the activities of UMW were directed against both primary and secondary employers and employees. There was evidence that the Union, by off-the-site picketing and other activities, induced and encouraged the employees of a secondary employer to engage in a concerted refusal, in the course of their employment, to transport or handle coal produced by appellee, and that one of the objectives of such action on the part of the Union was to force the secondary employees to quit the work of carrying appellee's coal, or to force appellee to bargain with the Union as the representative of its employees. 'Such evidence disclosed the broad pattern of appellant's campaign, with violence sufficiently spectacular and in such proximity to [appellee's] operation as to become known to secondary employers and their employees and to induce them to discontinue * * * hauling coal' for appellee. *Flame Coal Company v. United Mine Workers of America*, 303 F.2d 39, 43 (C.A.6). From the evidence, there can be no question that, not only appellee's employees, but also the secondary employers and employees knew all about the incidents occurring at the other locations and mines. They might reasonably regard these incidents as an indication of what might happen to themselves if they persisted in mining or hauling coal for appellee. The incidents with respect to other mines and locations constituted a form of influence by the Union. Such evidence was admissible. *United Mine Workers of America v. Osborne Mining Co.*, 279 F.2d 716, 725 (C.A.6). It is to be noted that the secondary employees were first interfered with before mining operations under the bargaining contract came to an end and before the start of any nearby primary picketing activity, of which the first interference could be considered an incidental and permissible part. Cf. *Local 761, International Union of Electrical, Radio & Machine Workers, AFL–CIO, v. N.L.R.B.*, 366 U.S. 667, 81 S.Ct. 1285, 61 L.Ed.2d 592."

*See, also*, Report of Trial Examiner, adopted by the Board and enforced by the Court (129 N.L.R.B. at 176, n. 81):

*Coal Company v. United Mine Workers of America* (6th Cir. 1963) 318 F.2d 591, 597–8, *cert. denied* 375 U.S. 966, 84 S.Ct. 484, 11 L.Ed.2d 415 (1964), *reh. denied* 379 U.S. 871, 85 S.Ct. 16, 13 L.Ed.2d 77 (1964); *National Labor Relations Board v. Local 140, Etc., supra*, 233 F.2d 539; *N.L.R.B. v. Dallas General Drivers, Etc., Local No. 745, supra*, 264 F.2d 642. It is fairly and reasonably inferable—in fact, the inference is compelled—that it was this activity which induced these employees to discontinue work as a means of putting pressure on the primary employers and this was the intention of the union in its area-wide activity.[37] We accordingly find no reason to deny recovery to these plaintiffs on this ground.

 The defendant attacks the right of LaCare to recover on the ground that La-Care failed to offer testimony that his employees were not the object of the defendant's organizational effort. This is a point made, it would seem, in this Court for the first time. Certainly, there is nothing in its motion for a judgment nor for a new trial that relates to this claim of error. The case obviously was tried on the assumption by all parties that LaCare was not a person whose employees were the object of the defendant's organization drive. We think any claim to the contrary comes too late.

 The defendant asserts, also, a number of alleged errors either in the procedure followed by the trial court or in its instructions, which infected the judgments. The first of these concerned the selection of the jury panel and the preemptory excusing of certain of the jury venire. Some two and a half weeks before trial, the trial judge advised all parties that he was instructing the

Clerk to inquire of the prospective jurors whether they had any "connection with the mining industry" and to remove from the jury list any who answered in the affirmative.[38] There was no objection from any party to this procedure until the actual selection of the jury panel itself had begun at the trial. Then, in the midst of the actual jury selection and while the trial judge was examining the jurors on voir dire, the defendant raised the point that the excusing of all jurors who had any "connection with the mining industry" denied it a right to a jury impartially drawn from a cross-section of the community, a right formulated in the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* Without regard to the validity of this argument had it been raised in time, the defendant's failure to raise it within seven days after receipt of the judge's letter constituted a waiver of any such objection. § 1867(c), 28 U.S.C. provides that "[i]n civil cases, before the voir dire examination begins, or within seven days after the party discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, any party may move to stay the proceedings on the ground of substantial failure to comply with the provisions of this title in selecting the petit jury;" and later, in § 1867(e), the statute states that "[t]he procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime, the Attorney General of the United States or a party in a civil case may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title." The defendant clearly did not exercise within the statutory time this "exclusive" proce-

---

"Such violence on the part of the union agents, although committed upon an employer and outside the presence of the employees, was of such a character that the latter could reasonably be expected to learn of it and be intimidated thereby."

**37.** This, of course, is an inference but, as the Court in *Electrical Workers* put it, "'[I]n the absence of admissions by the union of an illegal intent, the nature of acts performed shows the intent.'" 366 U.S. at 674, 81 S.Ct. at 1290.

**38.** The District Court's language was:

"I have been informed that about twenty-five per cent of the prospective jurors living in the Fairmont Division would have some connection with the mining industry. These people, in my opinion, should not be allowed to pass judgment in these cases—Therefore the jury will be composed of men and women residing in the Division who have no connection with the mining industry. Jurors of this type certainly ought to be more objective in the premises."

dure for raising the claim. It apparently recognized this, for it would entirely disregard that part of the trial judge's letter which stated unequivocally that any juror who had any "connection with the mining industry" was to be eliminated, and pointed to the earlier language referring to "persons who had an interest in any of the mines involved in the ten cases below, as well as persons who had ever mined coal in them, and members of their family." On the basis of this misreading of the trial judge's letter, it states in its brief that it had "no objection to the District Court's earlier exclusion." But, as we have seen, that "earlier conclusion" eliminated completely as jurors any persons having any "connection with the mining industry." There could have been no misunderstanding of the trial court's ruling in its letter to the parties, written almost three weeks before trial was set. The defendant accordingly failed to object in time and cannot now complain. Even were the objection not out of time, we are by no means convinced that the trial judge's ruling could be assigned as error. Unquestionably the issues in these cases were matters on which all persons in the mining industry have strong and fixed opinions. It is extremely doubtful that under any circumstances such persons could be considered impartial and unbiased in considering and deciding the issues in these cases. Given the discretion available to the trial judge in determining the qualification of jurors, it would be difficult to find a clear abuse of discretion in the action of the trial judge.[38a]

■ Beyond this broad objection to the method of selection of the jury panel itself, the defendant complains of the action of the trial judge in excusing two prospective jurors on voir dire. The first of these was the wife of a United Mine Worker pensioner; another "worked in the mine in '58 or '59." The objection to excusing of the jurors, as stated at the time by the defendant, was "to the excusing on that distant relationship." Whether a juror should be excused is ordinarily within the discretion of the trial judge and his discretion will not be disturbed except for clear abuse. *Bratcher v. United States* (4th Cir. 1945) 149 F.2d 742, 745, *cert. denied* 325 U.S. 885, 65 S.Ct. 1580, 89 L.Ed. 2000 (1944); *United States v. Mason* (10th Cir. 1971) 440 F.2d 1293, 1297–8, *cert. denied* 404 U.S. 883, 92 S.Ct. 219, 30 L.Ed.2d 165 (1971); *United States v. Freeman* (8th Cir. 1975) 514 F.2d 171, 174. We find no such clear abuse here. The wife of a United Mine Worker pensioner was clearly disqualified. Similarly, excusing one who was working in the mines at the time all this controversy was taking place was not a clear abuse of discretion.

■ Turning to the instructions, the defendant complains that the ruling of this Court in *Railing v. United Mine Workers of America*,[39] on the application of the statute of limitations to the claims of the plaintiffs was completely disregarded by the trial court. Specifically, it contends, for instance, that in the LaCare and Layman cases, the trial court, in its charge, did not bar such plaintiffs from recovering "[l]ost profits which [were] reasonably attributed to the loss of daily sales from April, 1958 to June 27, 1959." In reviewing this record, however, it does not appear that the defendant entered any objection to the instructions given on this ground, unless it was incorporated in defendant's requested instruction 7. Unfortunately, such requested instruction is not included in the appeal record and we cannot determine whether such instruction could afford any basis for this objection by the defendant. The absence of such instruction is not really material to the appeal, though. The record is clear throughout that these plaintiffs were not seeking lost profits prior to June 27,

---

**38a.** *Cf., also, Northern Pacific R. Co. v. Herbert* (1886) 116 U.S. 642, 646, 16 S.Ct. 642, 29 L.Ed. 755; *United States v. Rodriguez* (9th Cir. 1972) 459 F.2d 983, 984. In the latter case, the Court said:

"A litigant has no vested right to keep a particular juror on the panel, and the trial judge has broad discretion in excusing veniremen whom he has reason to believe may not be able to give both sides a fair trial."

**39.** 445 F.2d 353.

1959. Both Layman and LaCare filed specific statements of their claims, in which their damages were plainly itemized. In both instances, they gave full effect to the ruling by this Court in *Railing* and limited their claims strictly to the period from July 1, 1959. Any failure by the trial judge to have restricted the right of these plaintiffs to recover for lost profits to a period after June 27, 1959 could not accordingly have prejudiced the defendant and would have been a harmless error. Moreover, the trial court was careful in its statement of the claim of Kinty to emphasize that only damages subsequent to June 27, 1959 were recoverable and this seems to have been considered as a part of the later instructions on the other claims. In any event, though, the jury could not have been misled and the only claim in favor of Layman and LaCare submitted to the jury covered profits after July 1, 1959.

 The defendant is not clear in his objection to the instructions on the plaintiff Gates' claim of damages. Both during trial and after verdict, it objected that Gates' claim for loss of business as stated in his specification of damages in the amount of $43,000 was limited to his mining business, that he had made no claim for loss of his outside trucking business, and, that, because he had so limited his claim in his own specification of damages, any verdict in excess of $43,000 would be improper. No other objection was made, so far as we can ascertain from the record, to the instructions on Gates' claim. After the verdict was returned, the defendant contended that the verdict for $53,000 as rendered had to include $10,000 for loss of the trucking business and that this additional verdict for loss of Gates' trucking business was improper.[40]

Those objections in no way concerned any instructions, or absence of instruction, on the statute of limitations defense of the defendant. As stated in the record, defendant's objection really amounted to a motion to limit any verdict in favor of Gates to $43,000. We are persuaded the objection is well taken and that the judgment in favor of Gates should be reduced to the amount stated in his specification of damages, furnished under order of the Court in advance of trial to both the Court and the defendant, upon reliance of which defendant prepared its defense. With the verdict so reduced, any objection to the instructions on the claim of Gates or on the verdict rendered would appear satisfied.

 Finally, the defendant urges that the verdicts are all excessive and without support in the record. Since we have already indicated that the judgments in favor of Kinty and Kittle must be vacated, this objection relates only to the judgments in favor of Gates, Layman and LaCare. Both Layman and LaCare were operating under what appeared to be in both cases a lease at will. However, there was no reason to assume that, so long as they could successfully mine the leaseholds and pay the landlord the agreed royalties, their leases would not be extended. How long such situation should reasonably continue would be a matter that could only be resolved by the jury. In their calculations, Layman and LaCare assumed that their leases would continue for at least ten years and based their claims of damages on that basis. On this standard, Layman fixed his loss at approximately $36,000 and LaCare at between $70,000 and $80,000. The jury, however, felt such assumptions entirely excessive and drastically reduced the claims of these

---

**40.** The Court: The Court directs the Clerk to enter up judgment in each of these cases in accordance with the verdict of the jury.

Now, if you have any motions, I will hear what you have.

Mr. Combs: I'd like to renew the motion that the Court has deferred with reference to Thomas Gates. I think obviously he was given credit for ten thousand dollars for his trucking company, or he was claiming forty-three thousand in the coal business, and the

verdict is for fifty-three thousand. And I would like to renew that motion for the reasons heretofore stated.

The Court: Well, I understand you are basing your motion mostly on the grounds that they didn't fully advise you of that claim, and it was a belated claim, more than anything else. Is that correct?

Mr. Combs: Yes, Your Honor.

The Court: Well, I am going to deny it for this reason. * * * [Transcript, p. 93.]

plaintiffs. It allowed Layman but $14,000 and LaCare $38,000. The defendant urges, though, that these claims were based on estimated loss of profits, calculated on the basis of the profits of the parties immediately before the defendant's activities in the area began. It took the position that the profit experience used by Layman and LaCare was too brief to justify its use as a criterion for long term future profit extrapolations and in any event, the coal industry is too cyclical an industry to permit such extrapolations. This argument is not without some force. There has been, however, a violation of plaintiffs' rights by the defendant and the difficulty of calculating loss should not operate to immunize the defendant from liability. The Court—or, in this case, jury—must do the best it can in fixing fairly the damages due these plaintiffs. The true rule in this situation was well stated in the oft-cited case of *Story Parchment Co. v. Paterson Co.* (1931) 282 U.S. 555, 565, 51 S.Ct. 248, 251, 75 L.Ed. 544:

" * * * where from the nature of the case damages could not be measured with certainty by a fixed rule, the facts and circumstances tending to show the probable amount of such damages should be submitted to the jury to enable them to form—

'such reasonable and probable estimate, as in the exercise of good sense and sound judgment they shall think will produce adequate compensation. There is no sound reason in such a case, as there may be, to some extent, in actions upon contract, for throwing *any part* of the loss upon the injured party, which the jury believe from the evidence he has sustained; though the precise amount cannot be ascertained by a fixed rule, but must be matter of opinion and probable estimate. And the adoption of any arbitrary rule in such a case, which will relieve the wrong-doer from any part of the damages, and throw the loss upon the injured party, would be little less than legalized robbery."

We are of opinion that, following *Story*, the evidence was sufficient to sustain the verdicts as rendered. The same is true of the verdict rendered in favor of Gates, to which we have already referred.

To sum up:

(1) The judgments in favor of the plaintiffs Kinty and Kittle are vacated and the actions in their favor are remanded to the District Court for a new trial;

(2) The judgment in favor of the plaintiff Gates is vacated and remanded with directions that judgment be reduced to $43,000 and, as such, is affirmed; and

(3) The judgments in favor of Layman and LaCare are affirmed.

REVERSED AND REMANDED IN PART and AFFIRMED IN PART.